TRINITY EPISCOPAL SCHOOL COR-
PORATION and Trinity Housing
Company, Inc., Plaintiffs,

v.

George ROMNEY, Secretary of the De-
partment of Housing and Urban De-
velopment, et al., Defendants,

v.

STRYCKER'S BAY NEIGHBORHOOD
COUNCIL, INC., Intervening
Defendant,

v.

Roland H. KARLEN et al., Inter-
vening Plaintiffs.

No. 71 Civ. 4315 (IBC).

United States District Court,
S. D. New York.

Nov. 15 1974.

Demov, Morris, Levin & Shein, New York City, for plaintiffs; Eugene J. Morris, Martin Stuart Baker, New York City, of counsel.

Paul J. Curran, U. S. Atty. for the Southern District of New York, New York City, for defendants; David P. Land, Asst. U. S. Atty., of counsel.

Adrian P. Burke, Corp. Counsel for the City of New York, New York City, for City of New York; Hadley W. Gold, New York City, Robert F. Liner, Albertson, N. Y., Asst. Corp. Counsels, of counsel.

Marttie L. Thompson, Community Action for Legal Services, Inc., New York City, for intervening defendant; John de P. Douw, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., State of New York, New York City, for State of New York; Thomas R. McLoughlin, Asst. Atty. Gen., of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

### INTRODUCTION

This is a case directly affecting the future of a 20 square block community and its more than 35,000 current and former residents. The area is the West Side Urban Renewal Area ("Area") in Manhattan, New York City, north between 87th and 97th Streets, west between Central Park West and Amsterdam Avenue.[1] The West Side Urban Renewal Plan ("Plan" or "Final Plan") governs housing construction in the Area and was intended to bring about the rehabilitation and renewal of the Area; certain changes in the Plan would permit the construction of more low income housing and the admission of more low income occupants into existing

buildings in the Area. The action before us is to enjoin these changes,[2] and plaintiffs seek an order directing that future development proceed in a manner consistent with the Plan.

Plaintiffs are a private school within the Area and a group of middle income residents, primarily brownstone home owners; they claim that these changes would violate the Plan upon which they relied in choosing their homes, and, further, that such changes would cause the Area to deteriorate and become a ghetto. Defendants are the United States Government, the State of New York, the City of New York, and a community group of Area residents; their position is that these changes are necessary to provide sufficient housing to former Area residents who were displaced by the impact of urban renewal and who therefore have a right of return to the site of their homes. Defendants further contend that the proposed changes would not adversely affect the Area.[3]

The jurisdiction of this Court is invoked under the Fifth and Fourteenth Amendments of the United States Constitution and under 28 U.S.C. §§ 1331, 1343 and 2201.

It has been clear from the outset that the parties to this controversy represent not only themselves but also the interests of thousands of citizens from divergent economic and racial backgrounds with inevitably conflicting needs and de-

---

1. Following the body of this opinion is Appendix A, a map of the Area (admitted into evidence as Ex. 14A) showing site locations and use designations as of March 1966 (the most recent map admitted into evidence).

2. Plaintiffs Trinity Episcopal School Corporation and Trinity Housing Company, Inc. ("Trinity"), occupant of Site 24 within the Area, instituted this action on October 4, 1971, against the named defendants except Strycker's Bay Neighborhood Council ("Strycker's Bay"). Answers were filed by the City of New York ("City") and by the United States Attorney on behalf of the Department of Housing and Urban Development ("HUD") and by the State of New York ("State"). Thereafter, on April 13, 1972, Strycker's Bay, a public interest group of residents and community organizations

from the Area, joined as intervenor-defendant. On July 18, 1973, Roland N. Karlen and Alvin C. Hudgins, residents of the Area, and CONTINUE (Committee of Neighbors To Insure a Normal Urban Environment), another community group representing Area residents, moved to join as intervenor-plaintiffs. Their motion was granted on April 22, 1974 during trial.

3. Plaintiffs ask, in substance, that this Court (1) enjoin the construction of public housing on Sites 4 and 30 within the Area and reinstate their use designation as middle income housing; (2) direct that squatters (defined hereinafter) be removed from the Area; and (3) direct that new middle income buildings observe a housing ratio of 70% middle income to 30% low income, claimed to be a provision of the Plan.

mands. In large measure our decision herein is our effort to find a just resolution of these conflicts.

## ISSUES

The four issues agreed to by counsel at trial [4] (Tr. 48–52) are as follows:

(1) Whether there has been a breach of contract between Trinity, as sponsor of Site 24, and the City by reason of changes in the Area after execution of their contract and the manner in which the City has proceeded with execution of the Plan; [5]

(2) Whether the City was required to secure the written consent of plaintiffs Karlen and Hudgins as residents of the Pilot Project Area and based upon their contracts with the City to any proposed change in the Plan and particularly to the conversion of Site 30 from middle income to public housing;

(3) Whether construction of a public housing project on Site 30 would cause the Area to "tip" within the meaning of Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973) ("Otero");

(4) Whether the Department of Housing and Urban Development ("HUD") has complied with the National Environmental Protection Act ("NEPA"), 42 U.S.C. §§ 4321–4347, regarding its study approving construction of the public housing project on Site 30.

Finally, plaintiffs raised in their post-trial memoranda an additional issue as to whether the approval by the City of the conversion of Sites 4 and 30 from middle income to public housing was in compliance with the statutory procedures.

A motion for a preliminary injunction was made on July 18, 1973; on September 19, 1973, it was referred to this Court for an evidentiary hearing. During the course of the hearing the motion for a preliminary injunction was withdrawn and the hearing converted to full trial on the merits. Trial proceeded on that basis with a long interruption from October 11, 1973 to April 22, 1974 devoted to a series of conferences looking to a settlement embracing a formula acceptable to all parties. There were periods of great expectation accompanied sometimes by sudden, hopeful ascents only to be followed ultimately by a sharp decline clearly pointing to a trial as the only course for the resolution of a perplexing situation fraught with perilous overtones. After 30 full trial days, the trial was concluded on May 20, 1974. Final supplemental post-trial memoranda were received on July 19, 1974.

## I. HISTORY OF THE PLAN

Underlying the allegations of the parties is a conflicting understanding of the Plan, its purpose, and the scope of its commitments. We therefore undertake to set forth in considerable detail the history of the Plan's development and execution.

### A. Background

Under the National Housing Act of 1949, 1949 U.S.Code Cong.Serv., p. 408, urban renewal was characterized predominantly by slum clearance programs. These involved the total demolition and clearance of badly deteriorated target areas, frequently resulting in massive relocation of hundreds of families to substandard housing elsewhere in New York City. Entirely new communities were then built on the cleared sites in accordance with the predetermined urban renewal plan.

Growing national dissatisfaction with slum clearance led to changes in the concept of urban renewal and was reflected in the federal legislation. The provisions of the National Housing Act were amended in 1954 to expand the scope of

---

4. Plaintiffs made a post-trial motion for counsel fees regardless of the outcome of this action. We will deal therewith at a later time.

5. A site sponsor is any person, group of persons or corporation who desires to build, manage or own a particular site within the Area, after entering into a contract with the City regarding that site.

urban renewal to include, for the first time, those areas which had degenerated but had not yet fully deteriorated. The 1954 amendments provided for redevelopment of these areas on the basis of conservation and rehabilitation of sound properties, and demolition and new construction only of those properties which had fully deteriorated.

The legislation also provided special funds for "demonstration studies" aimed at developing techniques needed in this new approach. In 1956 the City applied for, and received, federal grant funds for a demonstration study of the 20 square blocks which eventually became the West Side Urban Renewal Area.

The study was organized to determine whether realistic and meaningful proposals for renewal of the Area could be developed. James Felt, Chairman of the City Planning Commission, conducted this study (Ex. A) and published it in April, 1958. He concluded that renewal, rather than demolition, was "desirable, practicable and economically feasible." (Ex. A, p. 4). Moreover, Commissioner Felt found that the Area, though deteriorating, had a number of residual strengths. Its proximity to public transportation and to Central and Riverside Parks as well as to many cultural and business centers had always made it a desirable residential area. In addition, much good housing stock remained, particularly along Central Park West and the numerous brownstones on the side streets.

The study also determined that the Area was maintaining a more favorable racial and economic level than was commonly achieved at the time. From 1950 to 1956, though the Area's Puerto Rican population increased almost eight-fold and the total white non-Puerto Rican population decreased by roughly a quar-

ter, nonetheless white families constituted more than half of all families who moved in during the period. Moreover, the median income in the Area increased by more than one-third which indicates that the white families and individuals who moved into the Area must have had above-average incomes to compensate for the low incomes of the newly arriving black and Puerto Rican families. (Ex. A, pp. 10–11).

The study demonstrated that, though the Area was threatened by obsolescence, it had nevertheless retained the foundations of a formerly sound residential area, and that it was suited for rehabilitation rather than demolition and clearance. The objective of the renewal program envisaged by the study was not to create a new community but rather to preserve and improve the existing community so as to continue to accommodate the varied needs of its population.[6]

### B. The Preliminary Plan

In accordance with the Felt study's recommendation that an agency be created to draft plans for the Area, the Urban Renewal Board ("Board") was appointed by Mayor Wagner and then designated as the agency responsible for carrying out renewal of the Area. On May 28, 1959, the Board submitted its Preliminary Plan for the Area. (Ex. 5). The Preliminary Plan recommended as a goal that approximately 7,400 dwelling units of new private rental and cooperative housing be constructed. Approximately one-third of these units would be in the moderate rental range, requiring some degree of tax abatement; the remaining two-thirds would be fully tax-paying. One site, Site 29, would be designated for low income public housing, accommodating 400 units, but the Plan stated that the feasibility of in-

6. As stated in the study: "What are the yardsticks against which a successful renewal plan should be measured? A reduction of the abnormal population turnover and elimination of the excessive overcrowding which contribute so greatly to the Area's de-cline. Maintenance of the economic and ethnic integration which is part of its tradition, is in accord with accepted City policy, and which will take into account the needs of its present population." (Ex. A, p. 12).

cluding some additional units in rehabilitated structures would be explored. (Ex. 5, pp. 6, 19–20).

The City Planning Commission ("Commission") conducted hearings regarding approval of the Preliminary Plan on June 29, 1959. (Ex. 6). The community expressed substantial criticism concerning the Preliminary Plan's failure to provide a higher proportion of public and tax-abated housing to meet the needs of low and middle income families in the Area. The Preliminary Plan was nevertheless approved by the Commission, but it recommended that the number of low rent units be increased to 800, by providing for 200 additional public housing units and approximately 200 low rent units in rehabilitated buildings. The Commission also recommended an increase in the number of tax-abated, or middle income, housing from 2400 to 3600 units. (Ex. 6, pp. 9–10).

After the Commission's approval, more public hearings were held by the Board of Estimate on September 17 and October 22, 1959. In its resolution of October 22, 1959 (Ex. 7), the Board of Estimate increased once again the number of low and middle income units in the Preliminary Plan. In addition, proposed modifications of the Preliminary Plan were introduced which reflected the City's concern that there be an effective relocation process as well as sufficient housing to accommodate dislocated Area residents at all income levels. Among those modifications were the following:

1. That the Urban Renewal Board make the necessary study of the people now residing in the redevelopment and rehabilitation areas, or as near that percentage as possible, and based on those findings, provide an increased number of middle-income and low-rent units within the project area more in line with the needs of the people in these categories and advise the Board of Estimate, two months before submitting a final plan, as to the location and quantity of required middle-income and low-rent units to be provided to house all the people in these categories.

2. That the minimum goals for low-rent shall be 1,000 units and the minimum goals for middle-income shall be 4,200 units.

3. That the project be developed at densities which will maintain, in general, the present overall population density.

4. That the construction of new buildings and the rehabilitation of existing buildings be so planned that, after a minimum initial dislocation of families, new buildings will be erected before dislocating further families; and those in the area next scheduled for demolition or rehabilitation will be given the opportunity to move into the newly-completed buildings.

5. That people be permitted to study the relocation plan and site priority machinery and have the opportunity to make recommendations to the Urban Renewal Board before the final plan is formally submitted to the Board of Estimate for adoption. (Ex. 7)

The Board of Estimate resolution made clear that the number of low and middle rent units was to be based upon the needs of Area residents as determined by a study of their income levels. Moreover, the proposal of 1,000 low rent units was a "minimum goal" and not a final determination of the number of units to be included in the Final Plan.

C. The Final Plan

The Final Plan was approved by the City Planning Commission on May 29, 1962 (Ex. 8). It proposed 1,000 units of public housing, including 200 units in rehabilitated buildings. The number of middle income units was increased to 4,200 of which 15% (630 units) were to be available at rents comparable to those in public housing under the new

"skewed rental" program.[7] Thus within the Area there was to be a total of 1,630 low rent units. In addition, 607 low rent units were to be made available outside the Area, but within its immediate vicinity, including 496 at three perimeter sites: Douglas Houses Addition, Amsterdam Avenue and West 125th Street, .and the site of Public School 93 at West 93rd Street and Amsterdam Avenue. The Plan also estimated that an additional 572 low rent units would be made available through the normal turnover in "existing public housing projects in nearby areas." Most significantly, however, the Commission report made plain that the number of low rent units then provided for by the Plan was not an irrevocable determination but rather the Commission's judgment at that time as to the appropriate number of housing units which would achieve the Plan's desired goals. As stated therein:

> There is no method by which we can predict the exact proportions in which to allocate the number of dwelling units at each rental level in order to achieve the broad objective of the Urban Renewal Plan. It is, however, our judgment, as well as that of the several City-wide civic organizations who appeared at the hearing, that the proportion submitted by the Housing and Redevelopment Board is satisfactory and will achieve the desired goals. (Ex. 8, p. 11).

The Final Plan, as approved by the Commission, provided that the Area be redeveloped in three stages: Stage I, from 93rd to 97th Streets, Stage II, 90th to 93rd Streets, and Stage III, 87th to 90th Streets. The purpose of "staging" was to minimize the disruptive effect of relocation, by enabling residents to move from one stage to another and return upon completion of their stage. (Tr. 226). The Final Plan, as approved by the Commission, also incorporated the Pilot Rehabilitation Project, comprising 81 brownstones on 94th and 95th Streets between Columbus Avenue and Central Park West, which had already been approved by the Commission and the Board of Estimate in 1960. The Pilot Project was used as a rehabilitation demonstration area "to establish more refined standards and to explore feasible methods of rehabilitation." (Ex. 8, p. 3).

Considerable community objection remained as to the number of low rent units to be provided. Suggestions for additional units varied from 2,000 units to 4,000 units with 2,500 being most frequently recommended. (Ex. 8, p. 9). Consequently, on the eve of the Board of Estimate hearing, scheduled for June 22, 1962, Mayor Wagner called a meeting to decide whether to raise the Plan's commitment to low rent units to 2,500. The meeting was attended by, among others, Milton A. Mollen, Chairman of the Housing and Redevelopment Board, Walter Fried, a member of the Board, Commissioner Felt and Herman Badillo, Deputy Commissioner of Relocation.

Mayor Wagner thereafter announced in a press release (Ex. H) dated June 21, 1962, that "[n]ew low-cost housing units within the twenty-block urban renewal area are to be increased from 1,000 to 2,500 under the terms of the Mayor's directive." The release further provided that in addition to the 1,000 units of new public housing construction, 1,010 low rent units within middle income buildings would be made available instead of the 630 originally approved by the City Planning Commission. This greater figure was to be achieved by increasing the number of middle income units and by increasing the percentage of skewed rental units within middle income projects from 15% to 20% and further, 280 units were to be provided by the Housing Authority in rehabilitated brownstones; finally, 210 additional units of public housing were

---

7. This is a procedure whereby rents in a particular building are arbitrarily varied so that some are for higher income and some are for lower income families, the overall average being fixed at the level required to operate the building economically.

to be built on the abandoned P.S. 93 site, which is adjacent to the Area. In addition to these 2,500 units within the Area and at the P.S. 93 perimeter site, Area relocatees would be given priority for apartments at two other perimeter sites: the Douglas Houses Extension at 100th Street and Amsterdam Avenue, and a new public housing project at 830 Amsterdam Avenue. It was estimated that this would provide an additional 285 low rent units.

### D. The 2500 Policy

One of the critical factual issues in this litigation is the significance of the figure of 2,500 units. Plaintiffs claim, in substance, that this total was a maximum not to be exceeded, and that it included 517 units at three perimeter projects: De Hostos (built on the site of P. S. 93), 830 Amsterdam Avenue, and Douglas Addition. Defendants contend, on the other hand, that 2,500 was intended as a minimum commitment, and that only in that sense are perimeter projects other than De Hostos included.

We will discuss this issue at length later in this opinion. We note here, however, that the source of the 2,500 figure appears to be the Mayor's press release. That release, which included only the P.S. 93 site in its calculation of the 2,500 units, made no mention of whether the figure was a minimum or a maximum. Mr. Fried, however, testified that Mr. (now Congressman) Badillo regarded the 2,500 commitment as necessarily a minimum calculation and that Mayor Wagner accepted that position. (Tr. 838, 923).[8] In materials presented to the Board of Estimate (Ex. D) following the meeting with Mayor Wagner, Congressman Badillo stated

that the 2,500 units were "to be provided both within the site [Area] and in the area adjacent to and surrounding the site [Area]," and that additional low rent units would be provided "by building additions to existing projects, rehabilitating brownstones, and as a result of turnover in existing low-rent public housing in the vicinity." (Ex. D, p. 7). Moreover, Congressman Badillo testified at trial that the Mayor's announcement of 2,500 low rent apartments was intended to be a minimum. (Tr. 3836).

It should be noted that on several occasions after 1962, the City reaffirmed its policy of providing 2,500 low income units. For instance, on December 9, 1966, Jason R. Nathan, Chairman of the Housing and Redevelopment Board, stated before the Board of Estimate that his agency would provide a minimum of 2,559 low rent units in the redevelopment of the Area. (Ex. 2). Thereafter, on October 6, 1967, in an open letter sent to Area residents, the Housing and Development Administration ("HDA")[9] reaffirmed the City's policy of creating 2,500 low rent units. (Ex. 3). Finally, on October 25, 1967, Mr. Nathan, appearing before the Board of Estimate on the proposed disposition of Site 6, again reaffirmed the City's intention "to build 2,500 units of low income housing in the Upper West Side," (Ex. 4, p. 1) and stated that the percentage of low income units in certain middle income buildings would be raised from 20% to 30%. The Nathan statement concluded with the following:

> The most important result is that housing for low income families will be in ample supply. There will be enough not only to meet the needs of the residents of the neighborhood who

8. Mr. Fried, who is currently Vice-Chairman of the New York City Housing Authority, also testified that the press release was inaccurate and that Mayor Wagner intended that all three perimeter sites be included within the 2,500 commitment. (Tr. 838).

9. HDA is the successor City agency to the Housing and Redevelopment Board by virtue of the New York City Charter (Local Law #58, adopted July 28, 1967) and Executive Order of the Mayor #56 dated November 28, 1967 which provides December 1, 1967 as the effective date of Local Law #58.

must be relocated, but to fulfill the total commitment of 2,500 apartments to which the city is pledged. (Ex. 4, p. 3).

E. Execution of the Plan: 1962–1968

The Plan went into execution in January, 1963. Construction went forward despite delays and administrative problems. By 1966 four public housing projects were ready for occupancy within the Area as well as the three perimeter projects (De Hostos, 830 Amsterdam, and Douglas Addition). (Ex. 5). As a result of the Plan's tangible achievements there was an increase in the investment of private capital. Among the numerous site sponsors and purchasers were plaintiff Trinity School, which invested over nine million dollars in Site 24 as a combination school and middle income housing project, and plaintiff intervenors Karlen and Hudgins, who invested $148,000 and $265,000 respectively in their brownstones in the Pilot Project Area. Plaintiffs contend that it was in this atmosphere of optimism and progress that they made their decisions to remain in or move into the Area.[10]

Between 1963 and 1966 the City amended the Plan four times, the first two carried forward proposals for public housing. The first amendment (1963) approved a plan for the acquisition and rehabilitation by the City Housing Authority of 36 brownstones for low income housing. (Ex. 11). The second (1964) provided for conversions of Site 36 from fully tax-paying housing to public housing and of Sites 12, 13 and 14 from fully tax-paying to partially tax-exempt housing at moderate rentals.

(Ex. 15, 16). In approving these changes, the City Planning Commission reemphasized its previous statement in connection with the adoption of the Final Plan:

> There is no method by which we can predict the exact proportions in which to allocate the number of dwelling units at each rental level in order to achieve the broad objective of the Urban Renewal Plan. (Ex. 15, p. 4).

The third amendment (1965) involved a change in the mode of rehabilitation of Site 23. (Ex. 17, 18). The fourth amendment (1966) provided for conversion of Sites 5 and 10 from fully tax-paying to partially tax-exempt housing and reconversion of Site 36 from public housing also to partially tax-exempt housing. (Ex. 19, 20).

The initial conversion of Site 36 to public housing by the second amendment brought the number of public projects planned for the Area to a total of five. The fourth amendment, however, reduced that figure to four, the number originally proposed in Mayor Wagner's 1962 press release. (Ex. H). All of these amendments to the Plan were enacted before any of plaintiffs entered into contracts with the City regarding sponsorship of their sites.

After the four public housing sites were completed in 1965, the next cycle of buildings readied for occupancy were four Mitchell-Lama cooperatives (Sites 8, 11, 16 and 17), using the skewed rental method for low-rent units, and a Mitchell-Lama rental building[11] (Site 14), using the State Capital Grant Assistance Program[12] for low rent units. (Ex. 5).

---

10. Other brownstone residents who testified in behalf of plaintiffs made similar claims. They are represented in this action by CONTINUE whose active membership is made up primarily of middle income brownstone owners in the Area; they are opposed to further changes in the Plan contending it will cause the Area to deteriorate.

11. Mitchell-Lama housing is the generic or common term used for moderate and middle income housing developed pursuant to Arti-

cle II of the Private Housing Finance Law of the State of New York and assisted by state or municipal mortgage loans and real estate tax exemption.

12. This is a subsidy program under which individual apartments are rented at market rental by the local housing authority and then subleased to a low income family at public housing rental with the difference being subsidized by the State.

By the time these first five Mitchell-Lama developments opened in March-May, 1967, a sharp increase in construction costs threatened the City's ability to meet its commitments for adequate low and moderate income housing. Between 1964 and 1967, because of construction costs and increasing interest rates, Mitchell-Lama rents more than doubled. The increase was so drastic, in fact, that for a while the program was suspended. (Tr. 2657–2660). The increase threatened not only programs providing moderate income units but skewed rental as a means of providing units at rents equivalent to public housing. There was a limit to how much differential between the skewed rental units and the other units would be feasible. Even before the drastic increase of costs in Mitchell-Lama developments began, the skewed rental units rented at levels higher than public housing.

The City's commitment to low and moderate income housing was in jeopardy; this can be seen in Mr. Nathan's statement of December 9, 1966 before the Board of Estimate (Ex. 2) in support of the fourth amendment to the Plan wherein he acknowledged that the City's "commitment" to 2,500 low rent units in the Area had been only a hope, principally because the only program available, other than public housing construction, was the skewed rental program. Mr. Nathan then announced that in addition to 400 skewed rental units in cooperative projects, 400 units would be provided by the Housing Authority under the leased public housing program,[13] and a minimum of 306 units under the State Capital Assistance Program. (Ex. 2, p. 2).

Subsequent difficulties, however, threatened a portion of the leased public housing promised within Mitchell-Lama projects. Accordingly, on October 25, 1967, Mr. Nathan again appeared before the Board of Estimate (Ex. 4) and advised that, in order to fulfill the 2,500 policy, the percentage of all public housing leasing would be raised from 20% to 30%, and that the percentage of state capital grant units on Site 6 would similarly be increased from 20% to 30%. (Ex. 4, pp. 1–2).

F. Execution of the Plan: 1968–1973

By 1968 construction of low income housing had come to a standstill. It had become clear that the Mitchell-Lama program was no longer an economically feasible means of providing moderate income housing. This dilemma forced the City to find a new source of funds' for middle income housing. The solution, albeit imperfect, was the Section 236 housing subsidy which became available from the federal government in 1968.[14] Using this subsidy in combination with Mitchell-Lama financing, rents could be cut almost in half. (Tr. 3167).

The first projects built in the Area using the combination of subsidy programs, Mitchell-Lama and Section 236, were Columbus Manor and Westwood House (Sites 21 and 22), both of which opened in June, 1971. The third was Leader House (Site 20), which opened in August, 1972. All used the leased public housing program to make available 30% of their units for low income households.

Although the Section 236 program was intended to provide moderate or middle income housing (Ex. 54) and not to supplement public housing, the program was restricted to persons with incomes no greater than 135% of the limit

---

13. This program operates in the same manner as the State Capital Grant Program but is subsidized instead under the federal public housing program.

14. This is a program whereby the interest rate on a federal or state financed mortgage is subsidized down to 1% in order to bring the rent of an individual apartment down to a level that is 25% of the tenant's income. See 12 U.S.C. § 1715z–1(c).

for public housing eligibility.[15] The program thus worked to exclude families whose incomes, though beyond the Section 236 limits, were such that they could not afford newly constructed Mitchell-Lamas. (Tr. 3166, 3758–3759). At the same time, because of the relatively low rentals in Section 236 buildings and the scarcity of low income housing, the Department of Social Services began to place welfare-assisted families in middle income units.[16] (Tr. 3194). As a result of this policy, and in order to meet the demands of Area relocatees, Leader House, Columbus Manor and Westwood House were occupied by low income households substantially in excess of their 30% allocation. (Tr. 1430, 2002, 3194–3195).[17]

As of January, 1969, 1,230 public housing units had been completed. In addition, about 20% of the 1,769 completed middle income units were inhabited by low income households; this made for a total of 1,584 completed low rent units. (Ex. 65). With Section 236 subsidies in short supply and the only buildings under construction being middle income, there was a growing community sense that the commitment to provide adequate low income housing would not be met. Eventually the City converted Sites 4 and 30 from middle income to

15. There is, however, an alternative "exception limit" according to which 20% of the total amount of interest reduction payments can be made for families whose incomes exceed this 135% formula but do not exceed the income limitations set forth at 12 U.S.C. § 1715$l$(d)(3). The following table, submitted by the City (by agreement of the parties) after trial at the direction of the Court (Tr. 3828–3829), sets forth the respective Section 236 public housing and housing authority income limits as of May 23, 1974 (see letter of Robert Liner, Esq. to the Court dated June 3, 1974):

Income and Rent Limits in
New York City
under Subsidized Federal Programs

ADJUSTED ANNUAL INCOME LIMITS

| No. of Persons | 236 Regular | 236 Exception | Rent Supplement | Housing Authority Leasing |
|---|---|---|---|---|
| 1 | $ 8,235 | $ 9,250 | $ 6,100 | $ 6,300 |
| 2 | 10,530 | 11,250 | 7,800 | 8,160 |
| 3 | 11,340 | 13,250 | 8,400 | 9,360 |
| 4 | 12,150 | 13,250 | 9,000 | 9,360 |
| 5 | 12,690 | 15,200 | 9,400 | 10,200 |
| 6 | 13,230 | 15,200 | 9,800 | 10,200 |
| 7 | 13,770 | 17,200 | 10,200 | 11,040 |
| 8 | 14,310 | 17,200 | 10,600 | 11,040 |
| 9 | 14,580 | 17,200 | 10,800 | 11,520 |
| 10 or more | 14,850 | 17,200 | 11,000 | 11,520 |

16. Pursuant to the Court's direction (Tr. 3828–29), the City certified the following information regarding the number of welfare assisted families at the three projects, including both leased public housing as well as the program initiated by the Department of Social Services (see letter of Hadley W. Gold, Esq. to the Court, dated May 28, 1974) : A. Total Welfare assisted families (various programs) in *Leader House*, excluding elderly and disabled: *62*. B. Total Welfare assisted families (various programs) in *Columbus Manor*, excluding elderly and disabled: *50*. C. Total Welfare assisted families (various programs) in *Westwood House*, excluding elderly and disabled: *27*.

17. Defendants concede that low income families occupy up to 50% of the total units in these buildings. (Tr. 3320–3322). Plaintiffs contend, however, that because of this policy as well as the similarity of Section 236 income limits to public housing limits, almost the full occupancy of these buildings is low income housing.

low income housing; it was this decision that precipitated the litigation before us.

Robert Hazen, then Commissioner of Development at HDA, testified at trial as follows regarding the circumstances leading to the conversion of Sites 4 and 30 to public housing:

> The events were that the subsidies for the moderate income housing, so-called Section 236, were, as I have indicated, in short supply and the long term feasibility, looking ahead, was uncertain at best. There was also a feeling on the part of many community representatives with whom the city met that the project had taken off economically in the sense that it was becoming more and more a fashionable middle to upper middle income neighborhood and that perhaps there was a danger that the low rent commitments would either not be met through delay or not be met through the inability of the subsidy—that particular subsidy program to work. (Tr. 3173).

However, despite the shortage of Section 236 subsidies, a direct public housing construction program was available. Accordingly, both community and government leaders came to support additional public housing constructions as the logical means of carrying out the City's policy. (Tr. 3173–3174).

At the same time (Spring, 1970), squatters occupied several buildings in the Area awaiting demolition, including that on Site 30. Their arrival, while not a new phenomenon in the City's urban renewal experience, exacerbated tensions between those who advocated an increase in the number of low rent units in the Area and those who felt that such an increase would be contrary to the letter and spirit of the Plan and would adversely affect the character of the Area. While most squatters were not from the Area, and to that extent were not Area relocatees entitled to "Area priority" in the allocation of low rent units,[18] nonetheless their presence pointed up the general need for low-rent housing and inevitably increased both political and community pressure for the creation of more low income units within the Area. Rather than evict the squatters, as plaintiffs contend should have been done, the City entered into rental agreements with them permitting them to remain until demolition was ready to proceed. The City has stated that according to HDA records there are currently 274 squatter families residing within the Area.[19]

In response to these pressures, the Housing Authority proposed conversion of Site 4 from fully tax-paying to public housing (270 units). The conversion was approved by the City Planning Commission on August 12, 1970 (Ex. 24) and by the Board of Estimate on September 17, 1970 (Ex. 28). Currently, however, there are no available funds to construct Site 4.

Similar considerations, particularly the unavailability of subsidies for middle income housing and unmet relocation needs, led to the proposed conversion of Site 30 from middle income to public housing (160 units). The proposal was approved by the City Planning Commission on August 11, 1971 (Ex. 26) and by the Board of Estimate on November 11, 1971 (Ex. 27). The report of the Commission approving the conversion shows that while one community organization,

---

18. HDA has stated that its policy regarding the squatters is that it will provide alternate temporary quarters in the area so long as they are available and ultimately consider the squatters for any remaining units "not required to meet the needs of those with higher relocation priorities." (Ex. 26, p. 5). We take this to mean that those squatters who were not originally Area residents will not be considered among the relocatees to whom the City is committed to provide housing within the Area. Accordingly, the number of low income units within the Area will not be increased to provide housing to those squatters who were not Area residents.

19. See letter of Hadley W. Gold, Esq. to the Court, dated May 28, 1974.

presumably CONTINUE, argued that the proposal would upset the balance between low and middle income housing, the bulk of opposition was on the ground that construction of a new project would require demolition of existing buildings occupied by squatters. Several community organizations and two dissenting members of the Commission favored rehabilitation of the existing building for the benefit of the squatters residing therein. The Commission, however, in approving the conversion and rejecting equal preference for squatters, stated, in part:

> All new housing in the West Side Urban Renewal Plan, including that proposed for site 30, was intended to provide relocation for on-site tenants displaced by the renewal activity. The original tenants on site 30, and thousands of original residents of the west side area, left their homes with the firm guarantee that they would have first priority in moving back into the new housing to be constructed. That guarantee still stands.

> If the City is to honor its obligation to those families who accepted the painful necessity of relocation, it must not accord a higher relocation priority now to others who have since taken over apartments the original tenants left.

> Failure by the City Planning Commission to approve the public housing project would leave the status of the renewal plan unchanged and site 30 would still be designated for middle-income housing. This would leave the status of the site in doubt and delay the building of greatly needed housing for the area. (Ex. 26, pp. 4–5).

G. Plans For Future Development

In October, 1973 the State of New York assumed responsibility for completion of the Plan. Lee Goodwin, New York State Commissioner of Housing and Community Renewal, testified:

> After reviewing a number of proposals with the City and considering a number of options to put this money in other parts of the State, we concluded that the most desirable use of funds from both the City's and State's standpoint would be the completion of the West Side Urban project which had been in planning and execution for more than a decade. (Tr. 3784).

The State and City are proceeding with the development of Site 41 and Site 44. Thereafter, the State has agreed with the City to undertake the development of Sites 9, 32, 35 and 45/46 (constituting a single site). All of the proposed projects will be financed through the Mitchell-Lama and Section 236 programs, with 30% of the units designated for low income families under leased public housing. (Tr. 3792–3796).

II. THE SIGNIFICANCE OF THE CITY'S LOW INCOME HOUSING POLICY

As we have discussed above, a critical issue here is the City's announced policy to provide 2,500 units of low income housing. A parallel issue, which we consider below, is the City's policy of maintaining a 70%:30% ratio of middle to low income units in middle income buildings in the Area. We find, on the basis of the history of the Plan from its initial promulgation until the present, that the 2,500 figure was intended neither as a fixed minimum nor as a maximum. Rather it was a political judgment on the part of City officials as to an appropriate number of units which would satisfy the housing needs of low income relocatees desirous of returning to the Area, while not compromising the Plan's overriding objective to create a racially and economically integrated community. No legal or binding commitment by the City was intended; the 2,500 figure was instead a statement of policy and intention. It was aimed at meeting the needs of low income relocatees to the maximum extent possible without endangering the private capital investment so necessary to economic integration. Both Roger Starr, Administrator of the Hous-

ing and Development Authority [20] and Walter Fried, then Vice Chairman of the Housing and Redevelopment Board (the City agency which administered the Plan), testified that balancing of these two interests was the critical factor in determining the number of low rent units to be constructed in the Area. (Tr. 397, 444, 889). Moreover, contrary to plaintiffs' assertions, the right of relocation was itself a paramount Plan objective. Though the testimony on this point is conflicting (Tr. 397, 714, 3157), the documentary history of the Plan makes clear that the City was committed to provide sufficient Area housing to low income relocatees desirous of return-

ing. This feature of the Plan has never changed.[21]

It is also clear that the 2,500 figure was intended as an estimate which could be modified subject to changing needs and conditions. That estimate, which was itself the product of numerous revisions, represented an assessment of low income housing needs balanced against the objective of maintaining economic integration. The assessment of such needs must inevitably vary [22] and it has been established here that the economic conditions assumed at the inception of the Plan have themselves drastically changed. (Tr. 2660–2661). According-

20. Mr. Starr was appointed HDA Administrator after his testimony in this litigation. His views do not necessarily represent those of HDA.

21. As late as 1969 when the Plan by all accounts was still being properly executed, HDA administrator Nathan included the following statement in his progress report:

The originally estimated completion date of the project was March, 1969. 1973 is now cited as the probable time of completion. The reasons for this delay are many. However, the problem of satisfactorily relocating the area's population in accord with the city's commitments is the primary cause of delay. Staging; attempting to temporarily on-site families so as not to necessitate their moving off the site while construction is in process; promising to provide satisfactory housing for all of those living in the area when the city took title who wanted to remain—these are all aspects of the relocation process contributing to the delay.

While it is true that a delay of almost Four (4) years results in greatly increased construction costs and therefore higher rents, this cost must be measured against the social benefits resulting from disrupting the population as little as possible and providing new housing for those whose homes were torn down. (Ex. 65, p. 3).

This statement was made before the advent of the squatters whose presence, plaintiffs contend, was the real reason for the conversion of Site 30.

22. At the conclusion of trial, the City (by agreement of the parties) certified the following information regarding the status of Area relocatees (see Mr. Gold's letter of May 28, 1974 to the Court):

*West Side Urban Renewal Area*
*Relocatees*

A. Relocatees in the West Side Urban Renewal Area on date of vesting of title in the City of New York 5,838

B. Relocatees placed in housing in the West Side Urban Renewal Area to date 1,900 to 2,000

C. Relocatees presently residing on temporary holding sites within the West Side Urban Renewal Area 114

D. Relocatees presently residing off-site who have expressed an interest to return 728

E. Relocatees listed on HDA fiscal list in addition to above (approximately) 2,500

F. Relocatees, individuals and families, not locatable (approximately) 480

ly, in order for plaintiffs to establish that the City is now violating the Plan by increasing the number of low income units in the Area, they must show that such an increase would endanger the integration of the Area and therefore the underlying purpose of the Plan.

Closely related to the 2,500 policy is the issue of the City's allegedly binding commitment to a 70%:30% ratio of middle to low income housing in the Area. It is important to note that, unlike *Otero, supra,* we are not dealing here with regulations adopted by the City pursuant to law, but rather with political intentions. The HDA statement of October, 1967 (Ex. 4) declared that the percentage of State Capital Grant units on Site 6 and of all public housing in Mitchell-Lamas contracted for thereafter would be increased from 20% to 30%.[23] In January, 1973 an HDA memorandum reaffirming the City's "commitment" to the "70:30 policy" declared in pertinent part:

> In 1971, after lengthy discussion in the West Side Community and due consideration of the needs and character of that community, HDA agreed, with the express approval of the Mayor's office, to a new policy concerning the tenant mix in all buildings which have the benefit of interest reduction subsidies under Section 236 of the National Housing Act in the West Side Urban Renewal Area. The policy, which was first adopted by community Planning Board No. 7, calls for maintenance of a ratio of 70%:30% between moderate and low income families in 236 building. (For this purpose, moderate income refers to families and individuals meeting the income requirements of the Section 236 program, including the exception limits, if and when allowed by HUD.) (Ex. 54).

■ It is probable that the 70%:30% policy was intended to include all Section 236 Mitchell-Lamas, as well as those using leased public housing to fulfill their low income requirement and which were constructed after the October, 1967 statement. Indeed, the 1973 HDA memorandum declared that violations of the policy at Leader House (Columbus Manor and Westwood House) were to be corrected through ordinary turnover. However, consistent with our finding with respect to the alleged 2,500 commitment, we conclude that the 70%:30% ratio was never intended as an irrevocable commitment binding upon the City. Furthermore, to sustain their claim with respect to this issue plaintiffs must establish that failure to adhere to the 70%:30% policy would likewise threaten the integration of the Area and consequently the underlying purpose of the Plan. This plaintiffs failed to accomplish by proof clear and convincing.

### III. THE CITY'S CONTRACT WITH TRINITY

Two of the issues before us involve alleged breaches of contract by the City; the first of these is closely related to the City's policy of providing 2,500 low income units and a 70%:30% ratio of middle income to low income tenants in middle income buildings; the second (*infra* at IV) relates to the alleged breach by the City of its contract with Karlen and Hudgins, brownstone owners. Plaintiffs contend, with respect to the first issue, that the City breached its contract with Trinity by reason of "the general changes in the West Side area after the fourth revision of the West Side Urban Renewal Plan." (Tr. 48, 51). They claim, in substance, that City officials orally advised them that the Plan's principal objective was to create a racially and economically integrated Area, and that this objective could best be achieved by the inclusion in the Plan of 2,500 units of low income housing; that this method would permit the City to deal equitably with the relocatees and, at the same time, preserve a healthy economic balance in the Area.

---

**23.** The 70%/30% ratio is included in Trinity's contract with the City as sponsor of a Mitchell-Lama on Site 24 (Ex. 14, Tr. 1035).

The 2,500 units figure became, in effect, a part of the various agreements made by the City with sponsors and with other persons making a commitment to the Area under the terms of the Plan. Plaintiffs argue that any change by the City with regard to its 2,500 and 70%:30% policies, or in the Plan generally, including the conversion of Site 30 from middle to low income use, would constitute a breach by the City of its contract.

Trinity was represented by Elliot Lumbard, Esq. in dealing with the City as to Trinity's sponsorship of Site 24. Trinity claims that during the period in which it was considering sponsoring Site 24 (1963–1968), Judge Milton Mollen, then Chairman of the Housing and Redevelopment Board, and other City officials assured Mr. Lumbard that Trinity could rely on the Plan being executed as it was then formulated since it had the full support of the Mayor and governing officials. (Tr. 966–972). Mr. Lumbard testified that Trinity was concerned about the solidity of the Plan and the future of the Area. He stated that City officials had assured him that they shared his concern and to that end had allocated definite income uses for each of the Area sites, including Site 30. (Tr. 982–984). Although Mr. Lumbard met on several occasions with City officials, he placed the greatest emphasis on, and recalled with the greatest particularity, two meetings attended by Judge Mollen in 1963 and 1964. At the second meeting Judge Mollen expressed the City's interest in keeping Trinity in the Area as a site sponsor; he made the alleged representations that Trinity could rely upon the Plan and referred to large charts showing the income designations for the various sites. (Tr. 1065).

Other area residents testified that similar representations were made to them. Specifically they alleged that Colonel William Hunter and Mr. Joseph Luria, who managed the City's Area office, represented to them as potential brownstone purchasers that the Plan called for a maximum of 2,500 low income units and that 30% of the units in middle income buildings would be allocated to low income families. (Tr. 1271, 1289, 1509, 1800, 1949, 1955). Plaintiffs maintain that these representations became implied and enforceable provisions of the City's contracts with respective purchasers of brownstones because they were indispensable in effecting the mutual concern of creating a balanced community.

 However, the language of their respective contracts forecloses the claims of Trinity and brownstone purchasers. Section F of the 1966 Fourth Revision of the Plan (annexed to and incorporated into Trinity's contract with the City, Ex. 14) specifically authorizes the City to modify and amend the Plan at any time subject only to the consent of the purchaser or lessee of the particular parcel covered by the modification. Section F provides as follows:

F. *Changes in Approved Plan*

This Urban Renewal Plan may be modified at any time by the City of New York, provided that if modified after the disposition of any land in the project area such modification must be consented to in writing, by the purchaser or lessee or their successors in interest of the specific property covered by the modification. This shall not be construed to require the consent of the purchaser or lessee or their successors in interest of any other parcel in the project area.

The parol evidence rule provides that in order for a purported oral agreement to vary a written contract, the oral agreement must not modify or contradict express or implied provisions of the written instrument. Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646 (1928); Aratari v. Chrysler Corp., 35 A.D.2d 1077, 316 N.Y.S.2d 680 (1970). Accordingly, to the extent that the alleged oral representations to Mr. Lumbard are construed as a promise by the City that it would not modify the Plan, they amount to prior negotiations that are inconsistent with an express provision of a written con-

tract and therefore barred by the parol evidence rule.

The underlying concept of urban renewal demands that the Plan could be modified at any time. Walter Fried and Roger Starr both testified that every urban renewal plan is subject to change and required flexibility for change in order to accomodate changing social, economic and racial conditions. (Tr. 398–400, 627–628, 935). Indeed, though Mr. Lumbard was unaware of it, the Plan, by the time Trinity entered into its contract with the City, had already undergone four revisions, including the changes in the income designation of Site 36. Thus the alleged representation that the Plan would not be modified is inconsistent not only with the express provision authorizing modification but also with the history of the Plan and the underlying concept of urban renewal.

■ Plaintiffs introduced into evidence two contracts by purchasers of brownstones from the City of New York (Ex. 35a and Ex. 2 annexed to plaintiffs' motion for a preliminary injunction). Section 110 of the contracts states that all prior understandings and agreements are merged into the contract, and that neither party relies upon any statement or representation not embodied in the Contract. Section 110 provides as follows:

§ 110.

It is understood and agreed that all understandings and agreements heretofore had between the parties are merged into this contract, which alone fully and completely expresses their agreement, and that the same is entered into after full investigation, neither party relying upon any statement or representation not embodied in this contract, made by the other. The Purchaser has inspected the building standing on said premises and is thoroughly acquainted with its condition.

The existence of this merger clause precludes the use of parol evidence to establish a breach of contract. Jones Memorial Trust v. TSAI Investment Services, 367 F.Supp. 491 (S.D.N.Y.1973); Hamilton Life Insurance Co. of New York v. Republic National Life Insurance Co., 291 F.Supp. 225 (S.D.N.Y.1968); Fogelson v. Rackfay Construction Co., 300 N. Y. 334, 340, 90 N.E.2d 881 (1950).

Even in the absence of such a merger clause, the parol evidence rule would bar use of the alleged representations to establish a breach of contract and for the same reasons stated above regarding Trinity School. Though the Plan was not actually annexed to the two contracts admitted into evidence, it is clear that they are subject to its provisions. Section 405 of both contracts states this explicitly:

"405. Wherever the provisions of the West Side Urban Renewal Plan, as amended through the date of execution of this Agreement, are inconsistent with the provisions of the Pilot Plan, annexed thereto, the provisions of the West Side Urban Renewal Plan, as amended as aforesaid shall govern."

Accordingly, Section F of the Plan, set forth above, governs the contracts and therefore excludes reliance upon alleged prior representations as implying a contemporaneous agreement which could not be modified.

■ Finally, there is doubt that the alleged representations were ever made in the form recalled and if so whether they were misconstrued and improperly relied upon. Colonel Hunter testified he never made any statements to anyone on any occasion that there would be 2,500 units of low income housing or that there would be an economic mix of 70% middle and 30% low income residents. (Tr. 3604–05). Plaintiffs' counsel stipulated that Mr. Luria if called would give the same testimony. Judge Mollen testified that he would not have undertaken to represent that he could bind the City regarding the Plan or any of its provisions because, as was demonstrated by its history, the Plan was subject to amendment. (Tr. 3686). Moreover, he gave testimony that Messrs. Hunter and Luria were never authorized to make

binding commitments upon the City regarding the Plan. (Tr. 3687). This is consistent with Exhibit 13, a brochure published by the Housing and Redevelopment Board entitled "Rehabilitation in the West Side Urban Renewal Area" which states, at page ii, that the function of its representatives at the site office was to "process applications for purchase and sponsorship of brownstones and furnish guidance and advice with respect to architectural and financial requirements and assistance." Thus, not only did Hunter and Luria lack authority to make such representations, but HRB explicitly limited the scope of their authority. The law is clear that acts or statements by City employees beyond the scope of their authority are not binding upon the City. United States v. City of New York, 131 F.2d 909 (2d Cir. 1942); Dalton v. Van Dien, 72 Misc.2d 287, 339 N.Y.S.2d 378 (1972); Lindlots Realty Co. v. Suffolk County,' 278 N.Y. 45, 15 N.E.2d 393 (1938); 53–04 97th Place Corp. v. City of New York, 156 Misc. 706, 282 N.Y.S. 519 (Mun.Ct.1935).

As we see it, plaintiffs have failed to show that the City or its employees ever made a commitment to a fixed and immutable number or percentage of low income units. Indeed, such a commitment would have been inconsistent with both the history and purpose of the Plan. As we have found, the 2,500 figure was never intended as a minimum or maximum number of low income units but rather as an estimate of the number of units needed to satisfy the demand for relocatee housing consistent with the objective of creating an economically and racially integrated community. That estimate would inevitably change, as it had in the past, to meet the shifting needs and demands of the community so long as such change did not threaten the Plan's objective. (Tr. 3158).

## IV.. THE CITY'S CONTRACT WITH KARLEN AND HUDGINS

Plaintiff-intervenors Karlen and Hudgins are, as discussed above, brownstone owners residing within the Pilot Project Area. We now consider whether the City was required to obtain written consent from them when it converted Sites 4 and 30 from middle to low income housing. Defendants concede that no such consent was sought or obtained.

They contend that this issue is governed by Section R of the "Final Plan for the Rehabilitation Demonstration Pilot Project" ("Pilot Project Plan") which provides:

R. *Changes in Approved Plan*

This Final Plan may be modified at any time by the City of New York, provided that if any such modification affects any real property previously disposed of by the City in the Pilot Project area, written consent to such modification must be obtained from the purchaser or lessee of such real property.

Plaintiffs claim that, pursuant to this provision, any change in the Urban Renewal Plan relating to any site in the Area (including but not limited to the Pilot Project area) which affects property within the Pilot Project Area must be consented to in writing by the owner or lessee of such property. Inasmuch as Karlen and Hudgins are affected by the conversion of Sites 4 and 30 to low income housing, though these sites are outside the Pilot Project Area, the City, they claim, was obliged to secure their consent to the conversion.

Plaintiffs' claim must be denied. The Pilot Project Plan was developed and intended as a forerunner to the Urban Renewal Plan ("Plan") as a means of developing refined standards and techniques for the execution of the Plan. When it was promulgated in 1962 the Plan became the definitive program for the development of the entire Area, and any inconsistencies with the Pilot Project Plan were to be resolved according to the terms of the Plan. To that end, Section 405 of both the Karlen and Hudgins contracts provides:

405. Wherever the provisions of the West Side Urban Renewal Plan, as

amended through the date of execution of this Agreement, are inconsistent with the provisions of the Pilot Plan, annexed thereto, the provisions of the West Side Urban Renewal Plan, as amended as aforesaid shall govern. Section F of the Plan provides:

F. *Changes in Approved Plan*

This Urban Renewal Plan may be modified at any time by the City of New York, provided that if modified after the disposition of any land in the project area such modification must be consented to in writing, by the purchaser or lessee, or their successors in interest of the specific property covered by the modification. This shall not be construed to require the consent of the purchaser or lessee or their successors in interest of any other parcel in the project area.

According to Section F, then, the Plan may be changed at any time subject only to the consent of the purchaser or lessee of the specific property covered by the modification.

■ We conclude that Section R of the Pilot Project Plan is inconsistent with Section F of the Plan. Therefore, Section F governs with respect to any changes in the Plan regardless of the impact upon property in the Pilot Project Area so long as that property is not the subject of the modification.

Plaintiffs further claim that there is no inconsistency between Sections R and F, that Section F deals with other owners in the Area but outside the Pilot Project Area. Were this proposition adopted, residents of the Pilot Project Area would have a right to veto any change in the Plan irrespective of whether the change covered property in the Pilot Project Area so long as they could show that the change affected their property. Area residents who resided outside the Pilot Project Area, however, would have no such right regardless of the impact upon their property for the sole reason that they do not reside in the Pilot Project Area. This is clearly untenable and must be rejected.

In order to succeed with any of these contract issues, however, plaintiffs must demonstrate not only that the City has breached its contracts with them, but also that they have suffered some sort of injury as a result of this breach. The purpose of the Plan, and clearly the intent of all contracts entered into pursuant thereto, is the racial, ethnic and economic integration of the Area. To show injury, therefore, plaintiffs must demonstrate that the City's alleged breaches threaten the Area's integration, or, in other words, that the Area will "tip." Whether the Area will tip, however, involves considerably more than its part in the resolution of the breach of contract issues; it goes to the very heart of this entire litigation and so we now undertake to deal with it.

## V. TIPPING

### A. Introduction

This issue is the crux of the litigation. Essentially, plaintiffs contend that the Area is in danger of tipping; that, given existing conditions, as more low income residents are introduced into the Area, the tipping point will be exceeded, middle income residents will flee the neighborhood which will then rapidly deteriorate. For this reason plaintiffs ask, *inter alia*, that this Court halt the planned construction of Site 30 as low income housing. While plaintiffs recognize that tipping has been considered a racial issue, they maintain that its true characteristic is the low income of the families involved, and that the racial element is a subsidiary factor. Specifically, they assert that "the indiscriminate admission of relocatee low income families" has caused the Area to reach the tipping point. Defendants respond that the "tipping phenomenon is a racial issue which relates to economics only insofar as minority persons, i. e., blacks and Puerto Ricans, are often associated with persons of low income." We have

concluded that defendants must prevail on this issue. Our reasoning, set forth more fully below, has two grounds: (1) the concept of tipping is racial and only incidentally related to income, and (2) even assuming that tipping does include economic classifications, plaintiffs have failed to show that the Area is, or is in danger of, tipping.

The primary issue in Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973), was whether the New York City Housing Authority was required to comply with its own regulation regarding selection of tenants for a public housing project. The Authority argued that to do so would create a non-white pocket ghetto that would operate as a tipping factor which would cause white residents to take flight and lead eventually to non-white ghettoization of the community.[24] The District Court granted summary judgment for plaintiffs, holding that, although the Housing Authority had a duty to foster and maintain racial integration, this duty could not, as a matter of law, be given effect where to do so would deprive a non-white minority of low cost public housing which would otherwise be assigned to it under the Authority's regulation. Our Court of Appeals reversed and remanded on the ground that there was a genuine issue as to whether the non-white concentration in the two project apartments would have a tipping effect which the Authority, in exercising its duty to integrate, was entitled to avoid by suspending operation of the regulation.

Plaintiffs herein impliedly invite us to expand the concept of tipping to include economic as well as racial classifications. We decline for two reasons: First, no legal authority exists for the proposition advocated by plaintiffs. Second, the concept of tipping cannot be successfully expressed in economic terms.

The concept of tipping has heretofore been recognized only as a racial issue.

In *Otero* the Court spoke of tipping solely in the context of changing racial concentrations within a neighborhood. That case followed an established line of authority holding that it is improper to build a housing project in a community which will cause a disproportionate increase in the concentration of minority persons tending to make the community a racial ghetto. Shannon v. HUD, 436 F.2d 809 (3rd Cir. 1970); Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972); Blackshear Residents Organization v. Housing Authority of the City of Austin, 337 F.Supp. 1138 (W.D.Tex. 1971); Crow v. Brown, 332 F.Supp. 382 (N.D.Ga.1971), and Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill.1969), aff'd, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971). Professional analysis has similarly equated tipping with racial change. *See* Ackerman, "Integration for Subsidized Housing and the Question of Racial Occupancy Controls," 26 Stanford L.Rev. 245, 260 (Jan. 1974), which concluded that housing projects which tipped had one or more of the following characteristics: (1) located in or near a minority area, (2) a black population well in excess of 30% of the population, and (3) a combined non-white population exceeding 50% of the total project population.

Secondly, tipping, as a phenomenon, cannot be discussed satisfactorily in terms of the income levels of housing residents. Plaintiffs claim, nonetheless, that an increase in the number of low income residents would be synonymous with an increase in the number of non-white tenants and that if the Area tips, middle income non-white residents will also flee. (Tr. 263–264, 301–303, 2526–2530). Plaintiffs' expert witness Roger Starr testified that tipping in the Area has nothing to do with the extent of the racial prejudice of its residents because they expected that the Area would con-

---

24. *Otero* used the term "non-white" to include Puerto Ricans "for purposes of this appeal only." 484 F.2d at 1126, n. 4.

tain a mixture of races and that they would not have moved in were they prejudiced. Rather, he contended, the Area will tip if the number of low income units exceeds 2,500 because these residents relied upon alleged representations of that figure as the maximum number of such units and because if this understanding is violated, their "subjective reactions" will cause them to flee. (Tr. 300–307).

■ This concept of tipping as a function of the gross numbers of low income residents must be rejected because, unlike the racial characteristics of a neighborhood, which are easily measurable, any definition of low income is imprecise and depends upon an arbitrary income ceiling, the family size, and the cost of living, none of which remains constant. If one adopts as the income criterion the eligibility limits of public housing, then the characterization of low income persons ranges from $6,100 maximum income for a family of one to $10,200 maximum income for a family of seven. If, however, one adopts the eligibility limits for Section 236 housing, which are 135% of the public housing limits, and which plaintiffs must necessarily adopt since they include Section 236 units within their calculation of total low income units within the Area, then the corresponding maximum income limits range from $8,235 to $13,770. And if one adopts the Section 236 exception limits, then the maximum income ranges from $9,250 for a family of one to $17,200 for a family of seven or more. Thus a family may be categorized as low income according to one set of criteria but as middle income according to another, and either categorization will vary as children are born into a family or reach majority or otherwise terminate dependency.[25]

Regardless of the fact that the 2,500 policy was never intended as a fixed maximum, reliance upon a fixed number of low income residents to measure tipping is unfounded when the definition of low income is itself subject to arbitrary and varying criteria.

More important, despite their protestations to the contrary, implicit in plaintiffs' argument is the belief that low income persons have a greater propensity to induce neighborhood deterioration than their middle income counterparts. This idea, however, was rejected in Nucleus of Chicago Homeowners v. Lynn, 372 F.Supp. 147 (N.D.Ill.1973). Moreover, two of plaintiffs' expert witnesses, Roger Starr and Dr. Frank Kristoff stated that aside from welfare and single parent families, one cannot associate a propensity toward anti-social behavior with low income families. (Tr. 231, 2547). In the absence of almost overwhelming proof of such a broad proposition, we too must reject it.

Even assuming *arguendo*, however, that tipping could be correlated with an increase in the low income population of a neighborhood, the questions are still raised as to what criteria should be considered in determining if the tipping point has been, or is likely to be, reached, and what standard of proof plaintiffs must meet in order to succeed. While community attitudes towards an increasing presence of low income families must of necessity influence the stability of that community and are therefore relevant to a tipping analysis, the gross numbers themselves should be considered only to the extent that they are of a measurable group. Moreover, what is crucial is not the numbers *per se* (except insofar as they affect community attitudes) but rather the ability of the community from the standpoint of its services and facilities to absorb and serve the needs of the particular group in question.

■■ We conclude for the purposes of this litigation that the tipping point of a community is that point at which a

25. To illustrate: Dr. Frank Kristoff, plaintiffs' expert witness, testified that he defined a household of three as low income if it had an income of up to about $6,800, and of four as low income up to about $7,800. (Tr. 2534).

set of conditions has been created that will lead to the rapid flight of an existing majority class under circumstances of instability which result in the deterioration of the neighborhood environment. The criteria to determine whether an area has reached or is approaching this point are: (1) the gross numbers of minority group families or families in a measurable economic or social group which are likely to affect adversely Area conditions; (2) the quality of community services and facilities; and (3) the attitudes of majority group residents who might be persuaded by their subjective reactions to the first and second criteria to leave the Area.

Pursuant to the standard adopted in *Otero,* plaintiffs must produce "convincing evidence" that, given the conditions of the Area, construction of public housing on Site 30 would cause the Area to tip. Although the rationale behind this stringent standard was not clearly developed in *Otero,* in Pride v. Community School Board, 488 F.2d 321 (2d Cir. 1973), the Court stated that *Otero* had adopted a stricter standard because it involved an outright denial of new public housing based upon racial classifications. In *Pride,* which involved the assignment of children because of their race to a school away from their neighborhood, the Court implied that a less stringent "rational basis" test would be applied where racial classifications are used for a benevolent purpose:

> Cases applying that [stricter] standard invariably involve state action having a segregatory or discriminatory effect. No court has applied the test where state action has had the effect and objective of reducing discrimination and segregation. 488 F.2d at 326–327.

*See* Note, The Benign Housing Quota: A Legitimate Weapon to Fight White Flight and Resulting Segregated Communities, 42 Fordham L.Rev. 891 (1974). See also Norwalk CORE v. Norwalk Redev. Agency, 395 F.2d 920 (2d Cir. 1968). Here, as in *Otero,* the proposed racial and economic classifications, while intended to preserve the Area, would clearly result in a denial of public housing, given the Citywide need for such housing and the scarcity of alternative sites within the City. Accordingly, plaintiffs, who are in substantially the same position as the Housing Authority in *Otero,* must meet a stringent burden of proof on the issue of tipping.

We now consider the three "tipping" criteria referred to in the second paragraph immediately preceding this one.

### B. The Community Involved

With respect to the first criterion, the community involved must be measured against some standard or norm, and the community involved must be disproportionate to the norm both in terms of the percentage concentration of minorities and the trend toward concentration. Defendants contend that the applicable norm is the entire City of New York. While comparative trends within the City as a whole or Manhattan in particular are significant, we find the critical norm or "relevant community" to be the West Side Community or Community Planning District 7, which extends from 59th Street north to 110th Street and from the Hudson River west to Central Park West. See *Otero,* 484 F.2d at 1129, n. 8. This is essentially consistent with the testimony of Mr. Walter Fried (the present Vice Chairman of the New York City Housing Authority) who stated that the zone to be considered extends from 106th Street to the Lincoln Center Area. (Tr. 695).

The population trend for New York City as a whole has been an outward migration of whites and an increase in black and Puerto Rican persons as set forth in the following table presented at trial by Dr. Frank Kristoff, an expert witness called to the stand by plaintiffs. (Tr. 2630–2631).

*New York City Population Profile*

| Year | White | Black | Puerto Rican |
|------|-------|-------|--------------|
| 1950 | 90% | 8% | 2% |
| 1960 | 81% | 13% | 6% |
| 1968 | 75% | 17% | 8% |

If a particular community had statistics showing both that the outward migration of whites was not occurring and that the percentage of whites was greater than District 7, Manhattan or New York City as a whole, then that would be some indication that a particular community is not in danger of tipping (Tr. 2636). For the year 1970, the following census profiles were presented. (Tr. 3486–3487):

| | White | Black | Puerto Rican |
|---|---|---|---|
| New York City | 67.7% | 22% | 10.3% |
| Manhattan | 60% | 28% | 12% |
| District 7 | 73% | 17% | 10% |
| West Side Urban Renewal Area | 76% | 15% | 9.5% |

Also as to District 7, there has been a general decrease in population of all racial mixtures from about 254,000 in 1960 to 212,000 in 1970 (Tr. 2639). Thus, District 7 is not experiencing the trend of a percentage decrease in whites which is the continuing trend for New York City (Tr. 2631), and the percentage of minorities for District 7 and the Area is less than New York City and Manhattan.

With respect to single parent families with children under 18, poverty, and median income, the following statistics were made a part of the trial record:

*Single Parent Families with Minor Children*
(Tr. 3487–3488)

New York City ....................... 4.8%
Manhattan ........................... 5.6%
District 7 .......................... 9.7%
West Side Urban Renewal Area ....................... 3.0%

*Poverty Families*
(Tr. 3488–3489)

New York City ........................ 11%
Manhattan ........................... 13%
District 7 .......................... 8.7%
West Side Urban Renewal Area ....................... 7.6%

*Median Income*
(Tr. 3489)

New York City ....................... $9,700
Manhattan ........................... $9,000
District 7 ..........................$11,250
West Side Urban Renewal Area ....................$12,700

These statistics strongly point to the inherent economic stability of the West Side area.

Dr. Frank Kristoff testified that the above statistics showing the economic and social strength of a neighborhood are major factors in considering its stability. (Tr. 2659, 3494). According to Dr. Kristoff, the West Side community was, and continues to be, strong and stable (Tr. 2653–2654) and among the upper 25% of communities within New York City (Tr. 2669). There is nothing statistically showing that the West Side community is currently tipping or in danger thereof.

Only two items of statistical evidence were submitted by plaintiffs relating to the economic and racial stability of the Area: their calculation of the number of low income units existing in the Area, and statistics submitted by Mr. Fried which allegedly show a declining white population in certain public housing projects. As to the former, plaintiffs contend that there are currently 3,300 low income families in the Area, including 517 units on three perimeter sites, 274 squatter families and the full occupancy of Leader House, Columbus Manor, and Westwood House consisting of a total of 601 units.

We find plaintiffs' calculation to be substantially inaccurate. First, it has been established that the squatter families are not permanent residents and will be removed as the buildings which they occupy become ready for demolition. Second, insofar as we are measuring the extent of fulfillment—or overfulfillment —of the 2,500 commitment, perimeter projects should not be included in the calculation. This is consistent with our finding that perimeter projects were intended to provide housing to dislocated Area residents for whom housing was unavailable in the Area proper. Finally, plaintiffs' assertion that Leader House, Columbus Manor and Westwood House are 100% low income is not supported

by sufficient evidence.[26] We have serious doubts as to whether Section 236 housing should be included in a low income category. Accepting, however, defendants' admission that up to 50% of the total units at these sites is occupied by low income families (Tr. 3315–3316, 3322 and 3356), the maximum number of low income units within the Area proper is 2,046. This consists of 795 units in four public housing projects, 853 units scattered among new middle income buildings and 276 units within rehabilitated buildings for a total of 1,924 units as well as the units occupied by welfare families at Leader House, Columbus Manor and Westwood House over and above the 30% allocated to low income families by the Plan itself, or 122 units. This includes 399 units of public housing at Stephen Wise House which according to State Commissioner Goodwin should not be considered low income because of their high income eligibility limits. (Tr. 3795).

The Fried statistics (Ex. 29) show that among five Area and perimeter public housing projects there has been from the time of their initial occupancy (1965 for the four Area projects, 1969 for the perimeter project) to December 31, 1972, a decrease in the white population from 52.4% to 46.1% and an increase in black and Puerto Rican occupancy from 15.6% and 31.3% to 19.5% and 33.6% respectively.[27] However, when these figures are compared to the above census figures for New York City, they show that the racial trends in those projects has been less severe than the general trend for the City. Indeed, the Fried statistics show that the percentage of black and Puerto Rican occupancy in both rehabilitated and leased public housing has decreased somewhat since initial occupancy.

Plaintiffs contend, however, that the Kristoff figures are irrelevant since they do not deal with racial and economic trends between 1970 and 1974 during which time plaintiffs claim the danger of tipping is in issue. However, the burden of proof is plaintiffs' and, in terms of statistical evidence, plaintiffs have shown nothing to rebut the conclusion that the Area is both racially and economically sound.

Plaintiffs also claim that the economic decline of the Area is shown by the lack of private investment and a decrease in property values. However, both Mr. Fried and Austin Haldenstein, a real estate broker specializing in the upper West Side, testified that the lack of private investment may be attributed to generally unfavorable economic conditions, including high mortgage rates and minimal tax benefits to potential purchasers of cooperatives. (Tr. 584–585, 750, 2331–2332). Moreover, the fact that several conventional apartment houses, now under construction in the West Side, will rent at straight, unsubsidized Mitchell-Lama rates of approximately $100 to $120 per room suggests that plaintiffs' conclusions regarding private investment are unsupported. (Tr. 794–797, 2656–2660, 3787).

Mr. Haldenstein testified that beginning in 1970 there was a sharp decline in the number of brownstone sales and a decline of some 10–20% in the resale value of renovated brownstones. (Tr. 2169–2170). However, the figures which he provided at the Court's direction (Tr. 2168–69) show a substantial increase in resale prices over the cost of

---

26. This assertion is not supported by the testimony of plaintiffs' witnesses which is inconsistent on that point. Arthur Bromberg, vice-president of Sulzberger-Rolfe, managers of Columbus Manor and Westwood House, testified that these buildings were 60% low income (Tr. 1429–1432). William Gaynor, however, former State Commissioner of Housing and Community Renewal, testified that he had been informed by Mr.

Bromberg that 80% of the two projects were low income. (Tr. 2813–2814).

27. Mr. Fried also testified that there had been a change in the character of public housing tenants; that the number of mother-headed households and those without an employable member was increasing. (Tr. 892). This was not verified at trial.

initial purchase.[28] Moreover, the number of resales for the period between 1969 and 1973 (five) was greater than from the inception of the Plan to 1969 (four). This shows that thus far there has not been any exodus of middle income residents as plaintiffs claim will occur if public housing is constructed on Site 30. On the contrary, the selling prices listed for the sixteen transactions including resales in the years 1970 through 1973 can only mean that individuals or families of substantial means replaced those who sold. In addition, none of the brownstone owners who testified had any unoccupied rental units and none of the units are occupied by low income families. Finally, Mr. Bromberg testified that all Mitchell-Lamas in the Area (managed by Sulzberger-Rolfe) were fully occupied. (Tr. 1626).

### C. Community Services

Plaintiffs have made their strongest showing with respect to the second criterion, the quality of community services such as schools, sanitation and police control. Eight Area residents testified on behalf of plaintiffs as to numerous incidents and conditions suggestive of deterioration of the Area. Without going into the details of these incidents or conditions, the testimony may be categorized into the following general areas: (a) Extensive criminal deportment: "pushing" drugs, muggings, murder, assaults, burglary; (b) Graffiti inside halls and stairs and on the exterior of buildings; (c) Loitering; (d) Excessive noise at late hours; (e) Public drinking; (f) Breaking glass, throwing rocks, bottles and firecrackers, breaking windows; (g) Garbage strewn about the streets, accumulated in buildings and tossed out of windows; (h) Verbal assaults and obscenities; (i) Starting fires; (j) Acts of vandalism; (k) Drug addiction; (l)

Fear of the neighborhood; (m) Increasing tension between low and middle income residents with particular emphasis on the squatters; (n) Stripping of cars and illegal car repairs on the street; and (o) A compelling necessity to hire private street guards.

In addition to the convincing testimony by Area residents on these reprehensible conditions, the managing agents and superintendents of Leader House, Columbus Manor and Westwood House offered similar testimony and added proof of the generally deteriorating condition of their respective buildings. One of the witnesses, Raphael Sifonte, states that he recently left his job as superintendent of Leader House because he would not expose his children to the drug situation there. In addition, Edward Sulzberger and Authur Bromberg, president and vice-president respectively, of Sulzberger-Rolfe which manages nine (9) properties in the Area (including Columbus Manor and Westwood House), and Jay Olnek of Hampton Management Co., which manages Leader House, testified that the conditions aforementioned in and about their buildings present serious management problems and that it is increasingly difficult to attract middle income families to the Area. (Tr. 1440–44, 1457–60, 2058–63).

We simply cannot overemphasize that the description of these revolting incidents and conditions was most disheartening. Defendants concede that the City sanctioned the presence of the squatters and the tenanting of Leader House, Columbus Manor and Westwood House with low income and welfare families in excess of the allocated 30%; they maintain, however, that they did this in order to meet the needs of low income relocatees consistent with the maintenance of a balanced economic and ethnic mix (Tr. 3169). While these needs must be met, the City has a con-

28. For example, one brownstone purchased in 1966 for $32,000 was resold in 1971 after renovation for $127,500. Another brownstone purchased in 1967 for $80,000 was resold in 1971 after minor work for $100,000. While much of the increase in price must be attributed to inflation and increasing value as a result of renovation, there is nothing to support plaintiffs' claim of declining property values. See Mr. Haldenstein's letter to the Court dated May 22, 1974.

comitant obligation to assure that in the process the right of other residents to a safe community free of such revolting and disgusting anti-social acts and conditions is not thereby threatened. The rights of relocatees of all economic strata must be dealt with fairly but the right of the community to continued safety and stability is of no less importance.

If we had determined that the aforementioned acts and conditions were symptomatic of a consistent pattern or general trend within the Area we would be constrained to conclude that it is in fact tipping. However, from the entire trial record it is clear that the offensive behavior in its most serious form, as summarized above, is localized within the three controversial Mitchell-Lamas. As to those buildings, there was a suggestion of substantial improvement. Frank J. Garcia, the superintendent of Columbus Manor, whose testimony we found persuasive, stated that since 1972 the situation has improved by 40% (Tr. 1679–1680). As to the eight Area residents who testified on behalf of plaintiffs, there was a marked concentration of witnesses from a small portion of the Area. Four of the eight reside in brownstones on 88th Street. A fifth until recently was a brownstone resident on 87th Street (technically not an Area resident). All five are active members of CONTINUE; their participation might have made them and their families inexcusably a hostile target for squatters and Area residents who seek additional low income housing (Tr. 1914–16). The remaining three witnesses were plaintiff-intervenors Karlen and Hudgins, brownstone owners on 94th Street, and a resident of St. Martins Towers on 90th Street, whose testimony, while sincere in its expression of concern for the future of the Area, lacked factual impression.

To rebut these witnesses, defendants produced eight residents, all except possibly one in the middle income category; they testified the Area is safe and free of any noticeable degree of anti-social behavior and that they do not foresee alarming conditions following the construction of public housing on Sites 4 and 30. These witnesses were owners of three brownstones on 88th, 91st and 94th Streets, residents of Leader House and St. Martins Towers and three other middle income apartment dwellers within the Area.

In addition we heard from Captain Peter Prezioso of the 24th Police Precinct, which includes the Area; he testified that crime figures in both the misdemeanor and felony categories have shown a marked decrease from 1971 through 1973 except for murder, rape, and felonious assault which he regards not "preventable crimes" (Tr. 3632a–3635; Ex. AJ). He gave testimony about various crime prevention programs instituted by the 24th Precinct over the past few years to improve the quality of police protection, including an anti-crime unit of 24 men in civilian clothes who patrol the area, block watchers and volunteer auxiliary policemen. (Tr. 3636–3646). Finally, Captain Prezioso stated that squatters have caused the police only one problem and that of minor significance. (Tr. 3648–3649).

Plaintiffs have adduced little effective testimony regarding the condition of the Area's schools, which together with the incidence of crime make up the most important criteria of the quality of community services generally. Several Area residents testified that they would not send their children to the Area's public schools because of their poor quality and minority racial concentration. We note however that this attitude is common to many middle and upper income residents throughout the City. In addition William Gaynor, former State Commissioner of Housing, testified from his observations of P.S. 84, an elementary school, and Joan of Arc Junior High School they were overcrowded and that there was a concentration of non-white children and a discipline problem (Tr. 2741). An Area resident whose children

attend P.S. 84 also testified regarding an extensive discipline problem at that School (Tr. 2605–2606).

In contrast, several teachers and administrators from Area schools, including P.S. 84, testified that though there was indeed a low income and minority racial concentration to a high degree (Tr. 3388, 3442, 3580), their analysis of the schools was positive and hopeful. The principal of P.S. 84 testified that that school has been cited as outstanding in its educational programs and that vandalism and exceptional disciplinary problems are rare. This analysis was supported by the testimony of a teacher coordinator at P.S. 84 who stated that the students come from a varied economic background and that many middle income families seek to enroll their children there. (Tr. 3264–3267). As to Joan of Arc Junior High School, which defendants concede has serious educational deficiencies, Mrs. Hannah Hess, former president of the Parents Association of P.S. 84 and current head of the Joan of Arc Mini School, testified that while there has been a decrease in violence at the High School, a great deal of hostility remains (Tr. 3274). At the Mini School, which contains 68 students randomly selected from the student body and reflecting a similar ethnic and economic breakdown, there has occurred through its personalized educational process a marked increase in the students' reading scores (Tr. 3574). The Mini School may expand to 120 students next year. Finally, Mrs. Elaine Schwartz, who directs a teacher training program at Fordham University and in that capacity has extensive contact with schools in the West Side Area generally, including Area schools, stated that while she would not send her children to Joan of Arc,

> The hard work that's been put into the public school systems that began with decentralization has really helped the elementary schools a great deal and it is working up slowly, we hope, to the junior high schools. (Tr. 3422).

We find that while there has been substantial testimony of numerous deplorable anti-social acts within the Area, the totality thereof does not depict a general deteriorating condition. Further, we are not convinced that the Area's community services, primarily its schools and police control, would be unable to absorb 160 public housing families on Site 30. Accordingly, from that standpoint the Area is not in danger of tipping.

### D. Community Attitudes

The third criterion is the attitude of Area residents to the prospect of additional low income units in the Area and in particular to the construction of public housing on Site 30. Plaintiffs contend that given the condition of the Area as they portray it, failure to adhere to the original alleged limit of 2,500 low income units and construction of public housing on Site 30 would cause massive flight on the part of middle income residents. Two brownstone owners testified that they have sold their brownstones because they felt the Plan was not being fulfilled and that the Area was deteriorating. (Tr. 1855–1856, 3014–3015). A third is awaiting the outcome of this litigation to see if the City will complete the Plan as he conceives it was originally promised. (Tr. 2383–2384). All residents called to the stand by plaintiffs stated that the Area was no longer safe and that they believed the City had abandoned both the Plan and the Area as originally conceived. In addition, plaintiffs' expert Roger Starr testified that a maximum of 2,500 low income units was adopted as a principle of the Plan, that tipping was directly related to this covenant and that it would occur if the 2,500 maximum were exceeded because it was relied upon by middle income families as a "crucial element in the Plan" (Tr. 303–304; 311–314). He maintained that the fear of crime in the Area is rare for a community in which there has been such a vast investment of public and private funds (Tr. 257).

As has been shown, not only is plaintiffs' reliance upon the 2,500 commitment unfounded, but more important, there is neither an excessive minority nor a low income concentration in the Area and the quality of its community services has not been proven inadequate. Accordingly, while we do not question the sincerity of plaintiffs' expressions of fear and concern, they have failed to establish it by substantial proof. There is, for example, testimony by other middle income residents that they do not fear for the safety of the Area or its future.

The assertion that a community might tip because of the unsupported fears of its residents demonstrates the inherent weakness of that tipping concept. In large measure, the tipping point is a subjective and prejudicial reaction of whites to minority group encroachment and to that extent is subject to a wide range of subjective factors. As one commentator has put it:

> If differing individual white tolerances for black neighbors and jittery white expectations are tipping's primary causes, then tipping points will vary according to the attitudinal composition of a given white population and the differing arrangements of environmental factors which could trigger uncontrolled white fears that an irrevocable chain of turnover has begun.

Ackerman, "Integration for Subsidized Housing," *supra* at 255. Moreover, fears held by people may have no connection to underlying facts (Tr. 2852). Accordingly, where, in light of the lack of alternative decent low income housing, a tipping analysis may mean an outright denial of housing to persons on the basis of suspect racial or economic classifications, such analysis must focus particularly upon objective and measurable criteria; community attitudes should then be considered only to the extent that they are supported by such criteria.

Mr. Roger Starr's assertion of an arbitrary tipping point of 2,500 units based upon community reliance on that figure does not go far enough. Not only is the term "low income person" undefinable with sufficient precision for the purpose of a tipping analysis, but Mr. Starr acknowledged that he did not know whether existing community services and facilities were adequate to support 2,500 units of low income housing (Tr. 372–373). Evidently Mr. Starr did not consider these objective criteria in his analysis, for he admitted that if the Plan called for 1,000 units or 5,000 units of low income housing, those figures might be the tipping point. (Tr. 300–305).

Plaintiffs assert that one of the causes of tipping is the lack of effective screening and eviction procedures to root out problem-prone families or persons who have committed acts of vandalism and crime. (Tr. 330, 779–786). Mr. Starr testified that he would favor construction of public housing on Site 30 and that it would not cause tipping if effective screening and eviction procedures were available (Tr. 345–349, 352).

However, both Mr. Joseph Christian, Chairman of the New York Housing Authority, and Mr. Fried testified that recent court decisions dealing with the Housing Authority's screening and eviction procedures have limited its access to records as a means of verification and that the Authority must rely primarily on personal interviews with prospective tenants (Tr. 781–786, 3811–3812). In addition, judicially imposed sanctions extending due process rights to the eviction process have made that process heavily time-consuming.[29] Nevertheless, Mr. Christian stated that the limitations have not "stymied our efforts at getting out undesirable families" and that the

---

29. See e. g., Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir.); cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970); Tyson v. New York City Housing Authority, 369 F.Supp. 513 (S.D. N.Y.1974); Lopez v. Phipps Plaza South, Inc., 498 F.2d 937 (2d Cir. 1974).

Authority has implemented its screening and eviction procedures to the fullest extent authorized by law. (Tr. 3812).

What is important here is not only the effectiveness of those procedures but rather the fact that the record is devoid of any showing that the procedures were ever resorted to by plaintiffs as a means of ridding the Area of problem-prone families. We are constrained to conclude that while the record is replete with testimony by plaintiffs' witnesses of anti-social behavior on the part of squatters and residents of Leader House, Columbus Manor and Westwood House, little if any effort was ever made to locate and evict the offenders. Indeed, while numerous residents from 88th Street complained of the squatters' offensive and, in many cases, unlawful behavior, they did not pursue the matter. Captain Prezioso for instance could recall only one incident involving the squatters that was ever reported to his precinct. While we find no fault with plaintiffs' motives in this litigation and approve many steps they initiated to solidify their position, we must point out that they have failed to exhaust the available administrative remedies, time-consuming though they may be, as a possible means of preserving the Area and freeing it of truly undesirable persons. The authorities must count on effective citizen assistance and participation.

We cannot subscribe to what we regard as an untenable position advanced by plaintiffs: they have associated the undesirable behavior of individuals with a broad economic class and claim that the expanding presence of that class is undesirable and a cause of tipping. We declare no meaningful proof exists in the trial record that the presence of that class is *per se* a cause of neighborhood deterioration. We reject it.

 We conclude therefore that plaintiffs have not shown convincing evidence that the Area is in danger of tipping or that construction of public housing on Site 30 would cause tipping.

To complete this point, we should note that numerous Federal, State and City officials also testified that the Area would not tip with the inclusion of additional low income housing beyond 2,500 units. Both Commissioner Goodwin and Mr. Christian (Chairman of the New York City Housing Authority) so testified. The fact that the State has assumed responsibility for completion of the Plan is extremely significant, for it reflects the opinion of the State Department of Housing and Community Renewal as to the hope and promise that condition of the Area afford. Commissioner Goodwin is convinced that the State's commitment for the Area was based upon its conclusion that the Area was a stable neighborhood and a desirable target for the commitment of State funds; that the State would not commit its funds to an area of the City which was in danger of tipping. (Tr. 3786–3789). She went further: even if there were between 3,500 and 4,000 low income families, that would not cause the Area to tip (Tr. 3798–3802).

In addition, contemporaneous with its NEPA study, HUD prepared a Project Selection Criteria Study which analysed many of the factors central to a tipping analysis and on the basis of that study approved construction of public housing on Site 30. While we do not adopt the HUD study as a substitute for our tipping analysis inasmuch as the study did not consider what we regard as imperative factors, such as community stability, its relevant portions are consistent with our own analysis and lend further support to the conclusion that the Area will not tip. We believe it would be helpful to enlarge somewhat upon the HUD Criteria Study.

### E. HUD Criteria Study

When federal funds are to be expended for low income housing projects, then, pursuant to 24 C.F.R., Part 200, Subpart N, HUD must make a site selection criteria study. The purpose of this study is to assure that low income housing is needed, that the project will be

accessible to community facilities and services, that the project will not unduly overburden existing community facilities and services, and that the project will not adversely affect the environment. The site selection criteria study measures eight separate standards which are to be rated superior, adequate, or poor. A poor rating on any standard results in automatic disapproval of the project. For our purposes, the relevant standards and a brief analysis of the facts supporting HUD's respective conclusions are:

1. *Need for Minority Housing Opportunity*: Within a one-mile radius of the proposed project, there is a population of 206,508 of which 72.8% are white and 23.6% Negro. Because the new housing project will be made available to those people within the Area relocating from substandard housing, there will be no increase within the community in the ratio of the proportion between minority and non-minority persons.

2. *Need for Improved Locations for Lower Income Families*: The proposed location of the new low income housing project is satisfactory because there are sufficient community facilities and services and such facilities and services will not be overburdened as the result of the project. Recreational and cultural facilities are available, public schools are generally newer and less crowded than in other areas of the City, religious houses of worship are near, the streets serving the project are minor, twenty additional parking spaces will be made available, subway service is nearby, four fire and four police stations are nearby, five hospitals close at hand, and a full variety of shops and restaurants exist. Therefore, the geographical location of the project is satisfactory.

3. *Relationship of the Project to the Growth and Development of the Community*: Because the low income housing project is an integral part of the West Side Urban Renewal Plan, it satisfactorily relates to the proposed growth and development of the Area.

William Green, Regional Administrator of HUD, testified effectively and convincingly that the first and second standards received adequate ratings because the proposed project was in an already integrated area where there is other federally assisted housing, and that purpose of these standards is to avoid concentrating minority and subsidized housing in any one section of a metropolitan area (Tr. 3290–3294). The third standard was given a superior rating. Mr. Green did not consider this standard to be relevant to a tipping analysis. On the other hand, plaintiffs contend that one of the major causes of tipping in this situation is that the proposed project is inconsistent with the Plan upon which they relied. Accordingly, the third standard is relevant to the extent that it rebuts the basis for plaintiffs' alleged reliance.

**F. The Pocket Ghetto Question**

█ Plaintiffs also contend that construction of Site 30 as public housing would cause an 80% concentration of low income units on 91st Street between Amsterdam Avenue and Central Park West creating a "pocket ghetto" within the meaning of *Otero*. In *Otero*, the Housing Authority argued that adherence to its first priority regulation would result in a racial composition in the Seward Park Extension buildings of 80% non-white and 20% white, and that since this would act as a tipping factor within the community, the Authority was obligated to prevent the formation of such non-white pockets rather than to limit itself to the overall current community racial proportions. 484 F.2d at 1133. The Court accepted in principle the concept of a pocket ghetto and stated that to prove the validity of its claim, the Housing Authority must show that the "segregative effect of compliance with [its regulation] would be impermissible or, more specifically, that it would create a pocket ghetto of the type that would lead to a substantial increase in the overall non-white population in the community, precipitating a trend to-

ward ultimate ghettoization of the entire community." 484 F.2d at 1135.

Plaintiffs, who are in substantially the same position as the Housing Authority was in *Otero,* have not met their burden of proof. Whereas in *Otero* the claim was that a pocket ghetto would be created in the buildings which were the subject of the action, here, in contrast, plaintiffs have arbitrarily assumed that the critical area is a two block section of 91st Street. While this is not an unreasonable assumption, in view of the fact that Site 30 borders on both 90th and 91st Streets and along Columbus Avenue, it certainly would be no less reasonable to define the critical area as 90th and 91st Streets from Amsterdam to Columbus Avenues. According to this definition, if this were the critical area then the percentage of low income units would be just over 50%, or 751 out of a total of 1481 units. (Ex. S). Alternatively, one could reasonably expand the critical area to Central Park West with the resulting percentage of low income units being 49%, or 1,055 out of a total of 2,117 units. (Ex. S). Plaintiffs have not shown that their delineation of the critical area in which the alleged pocket ghetto would be created is the correct one. In the absence of such a showing we find no reason to accept it as the basis with which to assess the validity of their claim. Moreover, their asserted percentages are subject to question. Plaintiffs include in their 80% calculation 399 units of public housing at Stephen Wise Towers (Site 29) which is adjacent to Site 30. Yet Commissioner Goodwin testified that on the basis of the high income eligibility limits at that project, she does not consider it to be low income housing. Again, as with the broader tipping analysis, plaintiffs have failed to define the generic term upon which they base their claims.

Even were we to accept plaintiffs' delineation of the critical area and their 80% calculation, they have not demonstrated that construction of public housing on Site 30 would in any way precipitate a trend toward the ultimate ghetto-

ization of the Area, required by *Otero* whereby plaintiffs were obliged to demonstrate with convincing evidence that the alleged pocket ghetto on 91st Street would lead to the tipping of the Area. This they failed to do.

## VI. HUD's COMPLIANCE WITH NEPA

Plaintiffs contend that non-compliance with the National Environmental Policy Act of 1969 ("NEPA") makes illegal the federal decision to fund public housing at Site 30. Two arguments are made with respect to this issue: (A) the decision is illegal because no environmental impact statement was prepared as part of the decision making process, and (B) the decision is illegal because the environmental review that was conducted by HUD was inadequate as a matter of law. We have concluded, for the reasons set forth below, that plaintiffs are incorrect with respect to both arguments and that defendants must prevail on this issue as well.

### A. The Environmental Impact Statement

Plaintiffs argue, in substance, that NEPA requires the filing of an environmental impact statement in this kind of a situation; that HUD's decision not to file such a statement was arbitrary and erroneous, and that therefore HUD's decision to fund Site 30 for public housing was illegal. We have concluded that HUD did not need to file an impact statement; our reasoning is prefaced by a discussion of NEPA and HUD's own regulations with regard to impact statements.

Briefly stated, NEPA makes environmental protection part of the mandate of every federal agency; it requires federal agencies to make a factual study of the effect of a proposed project so that the agencies will be able to ascertain whether the benefits of the proposed action will outweigh the detrimental factors. Based upon such analysis, the agencies may then make an informed decision as to whether to proceed with a

project. The statute requires an environmental impact statement only for "major" federal actions which "significantly" affect the quality of the human environment. 42 U.S.C. § 4332(2)(C).[30] This general legislative language was developed in the guidelines published by the Council on Environmental Quality ("CEQ").[31] Section 3 of these guidelines directed federal agencies to promulgate their own procedures for "identifying those agency actions requiring environmental statements . . . ." Council on Environmental Quality, Guidelines § 3, 36 Fed.Reg. 7724 (1971).[32]

These CEQ guidelines are merely advisory, because the CEQ does not have the authority to prescribe regulations governing compliance with NEPA. Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir. 1972). Following these CEQ guidelines, however, HUD published Circular 1390.1[33] setting forth the detailed procedures that it would employ for screening all HUD projects to insure its compliance with the Act as to each project.

HUD Circular 1390.1 established certain "thresholds" that are used to isolate those projects that may be major federal actions significantly affecting the quality of the human environment. A project passing the first threshold is then given special environmental consideration and study. This means that the project must be thoroughly investigated, and the HUD office involved must either file a "negative statement" indicating that approval of the project application is consistent with established HUD policy and standards and that the project would have no significant adverse effect on the environment or, if unresolved environmental issues or concerns remain, the HUD office must draft and circulate a detailed environmental impact statement.

These regulations established the rule that proposed apartment projects of one hundred or more units (including Site 30 with its 160 units) require a "Special Environmental Clearance." Additional-

---

30. 42 U.S.C.A. Sec. 4332 provides:
The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

 \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall con-

sult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes.

31. The Council on Environmental Quality is the agency established by Title II of NEPA, 42 U.S.C. §§ 4341–4347, to serve as a research, resource, and advisory body in the Executive Office of the President of the United States.

32. See also Council on Environmental Quality, Preparation of Environmental Impact Statements, Proposed Guidelines, 38 Fed. Reg. 10856–10866 (1973).

33. HUD initially promulgated draft procedures, 37 Fed.Reg. 22673 (1972) which became incorporated in its final regulations, effective July 1, 1973.

ly, paragraph 3 of HUD Circular 1390.1, Appendix A, states that issues raised by opponents and supporters of HUD projects shall be given careful consideration.[34] See Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421, 423–424 (5th Cir. 1973).

The precise question before us, then, is whether the negative statement or Special Environmental Clearance prepared by HUD, which concluded that the public housing project on Site 30 would not have a significant adverse impact on the environment, complied with the mandate of NEPA and with HUD's own guidelines.

The appropriate standard for reviewing HUD's threshold determination that an environmental impact statement was not required here is whether that decision was "arbitrary" or "capricious" under § 10(e) of the Administrative Procedure Act 5 U.S.C. § 706. Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972).[35] See also Calvert Cliffs' Coordinating Committee v. A. E. C., 146 U.S. App.D.C. 33, 449 F.2d 1109, 1115 (1971); Transcontinental Gas Pipe Line Corp. v. Hackensack Meadowlands Development Comm., 464 F.2d 1358, 1365 (3rd Cir. 1972); Conservation Council of North Carolina v. Froehlke, 340 F.Supp. 222, 225 (M.D.N.C.1972), Citizens for Reid State Park v. Laird, 336 F.Supp. 783 (D.Mo.1972).

In applying this standard to HUD's determination that the proposed public housing project would not significantly affect the environment, we must first define the term "significantly" as it is used in § 102(2)(C) and then determine what are the appropriate environmental criteria that must be considered in a NEPA study. As to the first task, the Second Circuit has interpreted the amorphous term as follows:

"In the absence of any Congressional or administrative interpretation of the term, we are persuaded that in deciding whether a major federal action will 'significantly' affect the quality of the human environment the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." Hanly v. Kleindiest, 471 F.2d at 830–831.

As to the range of environmental criteria that must be considered, plaintiffs contend that psychological and social as

---

34. Paragraph 3 states:

"*Special Environmental Clearance*" for *projects and major changes*: That additional review of environmental consequences which shall be applied to larger size projects with greater environmental significance (including all projects above thresholds in Appendix A) and to proejcts which are *controversial* with regard to whether or not HUD and other appropriate environmental policies and standards are being met, or *precedent-making* in the sense that important environmental circumstances are not treated in HUD's central office guidance documents. For this purpose, the HUD Environmental Clearance Wooksheet see (Appendix B) is suggested. All special environmental clearances shall result in either (a) a *negative statement* signed by the head of the HUD field office . . . ., indicating that approval of the application is consistent with established HUD

policy and standards and would have no significant adverse effect on the environment, or (b) if there are still unresolved environmental issues and concerns, the drafting and circulating of a *102(2)(C) environmental statement*. A negative statement or a 102(2)(C) environmental statement shall become part of the application file and shall accompany the application through the HUD review and decision process. (emphasis in the original).

35. Hanly v. Kleindienst, *supra*, involved a NEPA study of the proposed construction of a jail as part of the Court House Annex being built in the Foley Square neighborhood. The case was remanded twice by the Court of Appeals, first as Hanly v. Mitchell, 460 F.2d 640 (2d Cir. 1972) (hereafter "Hanly I") and then as titled above (hereafter "Hanly II").

well as physical factors must be included, also that HUD was required to analyze issues such as neighborhood stability and community attitudes and fears. Specifically, plaintiffs claim that HUD should have determined whether the proposed project would cause the Area to "tip." Defendants respond that a NEPA study does not require an analysis of psychological and social factors and that although HUD's study does not specifically mention the word "tipping," it did consider those measurable factors which bear upon the project's social impact, including the percentage of minority residents and the quality of community services and facilities, and on that basis HUD concluded that the project would not cause tipping. Finally, defendants contend that issues such as the propensity of low income persons to commit anti-social acts and community fear of the presence or influx of low income persons are not measurable factors and therefore not part of a tipping or social impact analysis.

The concept of tipping as defined in *Otero* is a racial population change in a community over a short period of time. Plaintiffs claim that a study of tipping necessarily involves an analysis of psychological and sociological factors relating to the attitudes and fears of community residents. There was considerable testimony by plaintiffs' witnesses, both expert and Area residents, that there is a rapidly growing fear in the Area of increasing crime and ghettoization, and that these attitudes are attributable to the increasing number of low income families, particularly the squatters.

The issue is two-fold: (1) Whether NEPA requires consideration of those tangible factors such as the incidence of crime and the quality of schools which are the basis for social attitudes of residents; and (2) Whether such attitudes must also be weighed independently of the tangible factors upon which they may be based.

The law is clear that the requisite environmental analysis includes

physical, social, cultural and aesthetic dimensions. *Hanly I*, 460 F.2d 640 (2d Cir. 1972), a leading case interpreting NEPA in this Circuit, states positively:

"The National Environmental Policy Act contains no exhaustive list of so-called 'environmental considerations,' but without question its aims extend beyond sewage and garbage and even beyond water and air pollution. See Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971); Goose Hollow Foothills League v. Romney, 334 F.Supp. 877 (D.Or. 1971). The Act must be construed to include protection of the quality of life for city residents. Noise, traffic, overburdened mass transportation systems, crime, congestion and even availability of drugs all affect the urban 'environment' and are surely results of the 'profound influences of . . . high-density urbanization [and] industrial expansion.' Section 101(a) of the Act, 42 U.S.C. § 4331(a)." *Hanly I* at 647.

Thus issues such as percentage of minority residents or proximity of public housing projects and the quality of community services such as the degree of crime, police protection, schools, hospitals, fire protection, recreation, transportation and commercial establishments are essential to a NEPA study.

Plaintiffs argue, however, that increasing the number of low income families will "tip" the Area because they will cause a rise in the incidence of crime and anti-social behavior in the Area such that middle income residents out of fear for the safety and stability of the Area will flee. Accordingly, they argue, the NEPA study of the environmental impact of public housing on Site 30 should have included an analysis of its effect upon the incidence of crime and its impact upon the attitudes of the community.

We find, however, that community attitudes and fears, or the propensity of certain economic or racial groups to commit anti-social behavior, do not lend themselves to the same type of objective

analysis and are not required in a NEPA study. In *Hanly II, supra,* plaintiffs contested the failure to consider the psychological and sociological effects upon the residents of the Foley Square neighborhood brought about by the construction of a jail within the new Court House Annex. Though the Court did not expressly decide the issue, it nevertheless observed:

> For the most part [plaintiffs'] opposition is based upon a psychological distaste for having a jail located so close to residential apartments, which is understandable enough. It is doubtful whether psychological and sociological effects upon neighbors constitute the type of factors that may be considered in making such a determination since they do not lend themselves to measurement. *Hanly II* at 833.

> Unlike factors such as noise, which can be related to decibels and units which measure duration, or crime, in which crime statistics are available, psychological factors are not readily translatable into concrete measuring rods. *Hanly II* at 833 n. 10.

Similarly, in Nucleus of Chicago Homeowners Association v. Lynn, 372 F.Supp. 147 (D.Ill.1973), plaintiffs sought to enjoin the construction of a low income housing project on the ground that HUD, in its NEPA study, failed to consider the effect of the social characteristics of low income people upon the neighborhood. The complaint was dismissed after trial. Plaintiffs asserted that low income people "possess a higher propensity toward criminal behavior and acts of physical violence, a disregard for the physical and aesthetic maintenance of real and personal property, and a lower commitment to hard work." *Supra* at 149. The court found that measuring human behavior and analyzing its consequences on the environment "is an especially difficult, if not impossible, task," relying upon *Hanly II, supra,* and Cross v. Harris, 135 U.S. App.D.C. 259, 418 F.2d 1095, 1107 (1969). As to whether the social characteristics of public housing tenants con-

stitute an environmental consideration within the scope of NEPA, the Court took the position that:

> "Environmental impact in the meaning of the Act cannot be reasonably construed to include a class of persons per se. The provisions of the Act concern actions which harm or affect the environment. Therefore, the social and economic characteristics of the potential occupants of public housing as such are not decisive in determining whether an impact statement is required under the Act. The relevant consideration is whether acts or actions resulting from the social and economic characteristics will affect the environment." 372 F.Supp at 149.

Plaintiffs' expert witnesses have testified similarly that aside from welfare families and those headed by a single parent, low income families could not be associated with a propensity for social problems. (Tr. 231, 2547). Another expert called for the purpose of assessing the adequacy of the HUD study stated that though fears may contribute to neighborhood instability, they may be irrelevant to actual facts. (Tr. 2852).

Accordingly, neither the alleged antisocial propensities of low income persons nor the fears which their increasing presence may engender are objective criteria of community stability and as such do not fall within the ambit of a NEPA study. We conclude therefore that determination by HUD that the conversion of Site 30 to public housing would not "significantly" affect the environment was not arbitrary or capricious. Further, we reiterate our finding that no convincing proof on this point exists in the record before us; certainly to engage in inferences instead would be both unwarranted and dangerous.

### B. The Special Environmental Clearance

Plaintiffs argue, alternatively, that HUD's environmental study, the Special Environmental Clearance (Ex. E), was inadequate as a matter of law. Among

plaintiffs' criticisms are that the study failed to consider community opposition to the project; that it ignored a large number of the proposed project's environmental consequences; that HUD did not conduct an independent analysis of environmental issues, and that the study failed to consider alternatives to the proposed project. We find, however, that the study is satisfactory in all these respects.

■ HUD's study (Ex. E) must be sustained if its findings that construction of 160 units of public housing on Site 30 were based upon adequate coverage of the requisite criteria defined above and are supported by the facts adduced at trial. The burden rests upon plaintiffs to raise substantial environmental issues and to establish that HUD's findings are based upon inadequate evidentiary development. Only to that extent do we consider evidence on the environmental impact of the proposed project in order to determine the reasonableness of HUD's findings. Hiram Clarke Civic Club, Inc. v. Lynn, *supra*, 476 F.2d at 425. See also Save Our Ten Acres v. Kreger, 472 F.2d 463 (5th Cir. 1973).

The study is made up of several parts. The first part is a one-page statement of the ultimate conclusion that the proposed project will not have a "significant adverse impact on the environment." The statement also points out that there was a "considerable organized opposition to the project . . . motivated by alleged social impacts . . . [but such] impacts are not environmental impacts within the context of Section 101(b) of NEPA."

Plaintiffs contend that HUD failed to consider community opposition to the proposed project or to provide an opportunity for the community to express its views regarding the environmental review. While there is no statutory provision on the subject, the law is now clear that, consistent with the obligation to "affirmatively develop a reviewable environmental record . . . even for purposes of a threshold section

102(2)(C) determination," *Hanly I, supra*, 460 F.2d at 647, before a threshold determination of significance is made, "the responsible agency must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision." *Hanly II*, 471 F.2d at 836. Moreover, Section 5(a)(3) of HUD's own regulations provides that "issues raised by opponents . . . of the HUD actions shall be carefully examined to determine whether the project involves significant environmental impacts."

HUD has complied with that obligation. The NEPA study includes several letters from officers of CONTINUE setting forth in detail its opposition to the project and Mr. John Maylott, director of the New York City area office of HUD at the time (the study was completed in April, 1972) testified that on numerous occasions he met with opponents of the project to ascertain their views (Tr. 3092–93). Thus, plaintiffs had ample opportunity to make known their views and submit facts relevant to the determination.

The second part of HUD's NEPA study consists of a four-page Special Environmental Clearance Worksheet. This section briefly addresses the five criteria set forth in Section 4332 of NEPA which must be analysed if a "detailed" environmental statement were required, as well as population density, the quality of community facilities serving the Area, and the incidence of crime. In respect to population density, the facts show that Site 30 will contain 160 units of which at least 16 will be for the elderly, a maximum population of 576 persons and a normal maximum number of children of 356. Neither the population density nor the dwelling unit density will significantly alter or be incongruous with the immediately surrounding area. With respect to public schools, all elementary and intermediate schools are under-utilized, and the overcrowding in the high school is being alleviated by new construction. Other

community facilities such as health, recreation, cultural and transportation facilities were found to be adequate; no issue of inadequacy has been raised by plaintiffs. In respect to crime, 1971 statistics placed the Area in the "high per capita" as to robberies and burglaries and "intermediate" as to auto thefts and homicide. The study concludes that there is no basis on which to conclude that the project would have an impact upon the incidence of crime in the Area.

The next portion of NEPA's study consists of a 13-page draft environmental clearance worksheet prepared by the New York City Housing Authority. (Ex. E-1). Part G of the worksheet states that Site 30 will have seventeen stories of which the ground floor will be commercial and that 32 of the units are preliminarily designated for the aged.[36] The project will be "an integral part of the area," will serve the needs of the relocatees "whose need for housing can only be met through the provision of low-rent public housing." Part H of the report, the stated purpose of which is to analyze "physical, social, and aesthetic dimensions," begins with an analysis of the housing stock describing them as in "good condition" of which "many have become cooperatives in recent years." As to the brownstone streets, "Trees and backyard gardens have been planted and many streets have regained much of their original charm." Adequate transportation is accessible. Public facilities serving the proposed site include four fire stations, four police stations, and five health facilities and hospitals. In the surrounding district there are 15 public housing developments with 5,266 units and 24 moderate income units with 10,795 units; and of a population of about 232,000, 80% are white, 12% Negro, and 8% Puerto Rican. The schools are less crowded and newer than in most areas of New York City. Private and parochial schools have greatly expanded, and such local private schools as Ethical Culture, Columbia Grammar, Franklin,

Baldwin, Bentley, Trinity, Collegiate and Walden attract students from all over Manhattan. The building of the project itself will create job opportunities for minority persons. The Area has many cultural and recreational facilities, and the financial commitment to it has produced "sound housing and supporting services for residents of all income levels . . . ."

In Part I, the Housing Authority concludes that it foresees no adverse influence created by the development. In Part J, the Authority concludes that there are no alternative site locations because of the scarcity of land. To shun the West Side Urban Renewal Area in favor of outlying sites "would be to relegate the inhabitants of these areas to the worst possible housing and environmental conditions with all the evils concomitant to such an existence." There are 135,000 families on the Authority's waiting list who "urgently require better housing."

The next portion of HUD's study includes data on zoning and data on air pollution, also CONTINUE's assertions and complaints. The following portion includes HUD's four-page evaluation of the application for Site 30; this evaluation includes many of the statistics reviewed above.

We find that the HUD study in its totality gave satisfactory coverage to both the environmental and social factors requisite to a NEPA analysis. While the evidentiary basis for its conclusions regarding the incidence of crime and the quality of Area schools is deficient in that it fails to develop a reviewable environmental record, the testimony adduced at trial (supra at Part V) demonstrates that HUD's conclusions in respect to these issues were reasonable and supported by the evidence.

Plaintiffs claim, however, that the NEPA study was inadequate because HUD did not conduct an independent analysis of environmental issues, that

---

36. Mr. Fried testified that this was inaccurate and that only 16 units were specifically designated for the elderly (Tr. 654).

HUD relied on information supplied by the Housing Authority. NEPA is specifically directed to the agency with overall responsibility for a proposed federal action and that agency must make its own independent, balanced judgment of the environmental implications of the proposed action. Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir. 1972); Calvert Cliffs Coord. Com. v. United States Atomic Energy Comm., 146 U.S.App. D.C. 33, 449 F.2d 1109 (1971). See also, Scenic Hudson Preservation Conference v. F. P. C., 354 F.2d 608 (2d Cir. 1965), cert. den. sub nom., Consolidated Edison Co. of New York v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). The reason for this restriction is that:

> "Certification by another agency that its own environmental standards are satisfied involves an entirely different kind of judgment. Such agencies, without overall responsibility for the particular federal action in question, attend only to one aspect of the problem: the magnitude of ʿcertain environmental costs. . . . Thus the balancing analysis remains to be done. It may be that the environmental costs, though passing prescribed standards, are nonetheless great enough to outweigh the particular economic and technical benefits involved in the planned action. The only agency in a position to make such a judgment is the agency with overall responsibility for the proposed federal action—the agency to which NEPA is specifically directed." *Calvert Cliffs, supra,* 449 F.2d at 1123.

Moreover, where the judgment relied upon is that of the applicant, i. e. the Housing Authority, there is the possibility that the applicant's statement may be based upon self-serving assumptions. See Greene County Planning Bd. v. F. P. C., *supra,* 455 F.2d at 420.

■ Here, however, while HUD did in fact rely upon information supplied by the Housing Authority in its applica-

tion (the Draft Environmental Worksheet), HUD made an independent analysis and judgment based upon all the information available to it. Moreover, that analysis uncovered the only significant inaccuracy in the application regarding the existence of community opposition to the project, and HUD officials met independently with those opposed in order to ascertain their views. This demonstrates not only did HUD exercise independent judgment but also that it verified the quality of the information submitted. The cases upon which plaintiffs rely are inapposite for they involve situations wherein the agency charged with a NEPA study substituted the judgment of another agency. See *Calvert Cliffs, supra; Greene County, supra.* We have found no authority for the proposition that HUD may not rely upon information submitted by another agency so long as it makes its own judgment as to the environmental impact of a proposed project.

■ Finally, plaintiffs contend that the study was inadequate in that it failed to consider alternatives to the proposed project or its cumulative effect in the context of related government actions, and that an environmental impact statement should have been prepared relative to the whole Area. As to the last claim, we fail to see its relevance to the issue before us—whether HUD's NEPA study approving Site 30 is supported by the facts. As to consideration of alternatives, this is required only in an environmental impact statement; HUD had determined that such a statement is not necessary because the project will not significantly affect the environment. Moreover, the Housing Authority stated in its draft environmental clearance worksheet that, considering the scarcity of available sites and the unmet needs for public housing, there are no alternatives. As to consideration of related governmental actions, such as the tenancy of certain middle income buildings with low income tenants in excess of 30% as allegedly planned, the leasing of middle income designated units for wel-

fare families and the conversion of Site 4 to public housing, HUD found that the Area was being developed according to an approved urban renewal plan, that the proposed project was consistent therewith and that from an evaluation of the Area, its raw numbers and physical condition and the quality of its community services, the building of a public housing project on Site 30 would have no adverse environmental impact. This, in our judgment, constitutes an adequate consideration of cumulative impact measured by the standard set forth in *Hanly II, supra.*

Accordingly, we conclude that plaintiffs' attacks are ineffective. Under the circumstances before us we find that HUD did not need to file an environmental impact statement and that the environmental study which it did conduct was legally sufficient.

## VII. THE CITY'S APPROVAL OF THE CONVERSION OF SITES 4 AND 30

Plaintiffs have raised an additional issue in their post-trial memoranda regarding the approval by the various City agencies of the conversion of Sites 4 and 30 from middle income to public housing. They contend that such changes in land use designation under an urban renewal plan require a formal plan change which must be processed pursuant to Article 15 of the New York General Municipal Law and the National Housing Act of 1949, Section 105(a) and (d). Processing pursuant to these statutes requires certified approval by HDA, the State Commissioner of Housing and Community Renewal, the City Planning Commission, the Board of Estimate and the Federal Government. Defendants concede that approval of the changes was effected pursuant to Section 150 of the New York State Public Housing Law rather than Article 15 of the General Municipal Law. They claim, however, that the substantive requirements of both statutes are essentially identical and that plaintiffs therefore can claim no injury or denial of a fundamental right.

This issue was not among those stipulated to at trial. Moreover, despite the testimony of numerous federal, state and city officials, plaintiffs made no inquiry as to the proper mechanics of effecting conversion of Sites 4 and 30, such that the issue might have been properly met and clarified at trial. However, inasmuch as this issue is reasonably related to those raised at trial and in the pleadings, we consider it to the extent of determining whether failure to process the changes pursuant to the General Municipal Law deprived plaintiffs of any substantive right or of procedural due process.

Because the Housing Authority has jurisdiction over public housing projects in the City, HDA requested the Authority to prepare a Plan and Project for public housing on both Sites 4 and 30 for submission to the City Planning Commission and the Board of Estimate, pursuant to Section 150 of the Public Housing Law. The Plan and Project for Site 4 (Ex. 23) was submitted to the City Planning Commission which, after a public hearing held on July 5, 1970, unanimously approved the conversion to public housing and found it consistent with the Plan. (Ex. 24). Both the Plan and Project and the Report of the City Planning Commission establish that the site change was considered within the framework of the Area and its plan. The Plan and Project states in relevant part:

"The site [Site 4] has been designated for redevelopment as part of the West Side Urban Renewal Plan. The project will serve as a relocation resource for tenants who will be displaced from other sites still to be developed within the urban renewal area." (Ex. 23, p. 1).

The Site 4 public hearing before the Board of Estimate took place on September 17, 1970. The Board's resolution (Exhibit 28) approved the City Plan-

**1084**

ning Commission's Report on the Site 4 change and HDA's Site 4 Plan and Project, and authorized a conveyance of the Site 4 property to the Housing Authority for the proposed project. The Board's resolution also identified the Project as Site 4 in the Area and states that the Project will serve as a relocation resource for tenants displaced from the sites within this Area.

The same procedure was followed for the conversion of Site 30 to public housing. At the request of HDA, the Housing Authority prepared and submitted to the City Planning Commission a Plan and Project for public housing on Site 30, which is replete with references to both the Area and Plan. (Ex. 25). A public hearing was held before the City Planning Commission on June 23, 1971. Its report (Ex. 26, p. 5) approves conversion of the site to public housing and states that the change is necessary "to help achieve the goals of the West Side Urban Renewal Project." The Report discusses many of the issues raised in this litigation, i. e. squatters, allocation of low income units and relocation priorities, and states:

"All new housing in the West Side Urban Renewal Plan, including that proposed for Site 30, was intended to provide relocation for on-site tenants displaced by the renewal activity." (Ex. 26, p. 3).

The final approval for the Site 30 change was granted by the Board of Estimate after public hearing on November 11, 1971. The Board's resolution (Exhibit 27) adopted the Commission's report and approved the change in site designation in essentially the same terms as for Site 4. It should be noted that twenty-two (22) speakers appeared at the Board's public hearing, for and against the change under consideration, including representatives of Trinity and CONTINUE as well as Messrs. Starr and Fried.

 The fundamental requisite of due process is the opportunity to be heard, to be aware that a matter is pending, to make an informed choice whether to acquiesce or contest and to assert before the appropriate decision-making body the reasons for such choice. Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 336, 70 S.Ct. 652, 94 L.Ed. 865 (1950); Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914). In light of the full hearings held with respect to the conversion of each site before both the City Planning Commission and the Board of Estimate, it cannot be said that plaintiffs did not have full and ample opportunity to express their opposition. Moreover, the reports of both the Commission and the Board establish that the conversion of both sites was considered in light of the Plan and found to be consistent with the overall development of the Area. Plaintiffs have failed to establish that consideration of the proposals under the General Municipal Law rather than the Public Housing Law would have in any way resulted in the use of different criteria, let alone a different conclusion.

 As to the consent of the State Commissioner of Housing and Community Renewal, Article 15, Section 514 of the Urban Renewal Law provides in pertinent part as follows:

" § 514. Filing of proposed plans

\* \* \* \* \* \*

Upon receipt of a copy of a proposed urban renewal program, or any proposed change therein, the commissioner may transmit his criticism and suggestions to the municipality or agency, as the case may be. No change in an urban renewal program assisted by state loans, periodic subsidies or capital grants may be made by a municipality or agency without the approval of the commissioner."

Defendants concede that no such consent was ever obtained pursuant to that statute. However, it is clear from the testimony of the current Commissioner, Lee Goodwin, that the State has no objection to and is in full accord with the construction of public housing on Sites 4

and 30. We conclude for the purpose of this litigation, and in light of plaintiffs' failure to raise this issue until the last minute (a lapse of almost 2½ years from the commencement of the action to the conclusion of trial), that the implicit approval of the Commissioner sufficiently satisfies the substantive requirements of Section 514 to defeat plaintiffs' claim.

Margulis v. Lindsay, 31 N.Y.2d 167, 335 N.Y.S.2d 285, 286 N.E.2d 724 (1973), on which plaintiffs rely, involved the Forest Hills Public Housing Project; it is inapposite. The issue there was the necessity of a resubmission to the City Planning Commission and Board of Estimate of a new Plan and Project for public housing because of a change in the number, height and bulk of the proposed building after the project had been once approved at earlier public hearings. There is no requirement here for another public hearing, since the issues in controversy were fully explored at the hearings already held and there has been no proposed change since those hearings. Plaintiffs do not contend that the Site 30 and 4 projects have substantially changed such that a new series of public hearings is required, but rather that the initial hearings were defective. Accordingly, *Margulis* is inapplicable to this case.

As to the issue of federal approval, Section 105(a) of the National Housing Act provides that contracts for loans or capital grants by the Federal Government require that the Urban Renewal Plan be approved by the local governing body and that the approval include certain findings. As pointed out above, the changes in the Plan were clearly approved by the City's local governing body (the Board of Estimate), and the required findings, although not stated formally in the Board's resolution or in the precise language called for by the General Municipal Law, are present throughout the City Planning Commission's Report in each case, which Re-

ports were adopted and approved in each of the Board's resolutions. Section 105(d) of the National Housing Act provides that no land for any project assisted under Title I of the National Housing Act be acquired by the local public agency (City of New York) except after public hearing on notice. Since no issue of improper land acquisition is involved in this litigation, Section 105(d) is inapplicable.

The change in designation for Site 30 was clearly processed through and approved by HUD. That approval took the form of its NEPA study (Exhibits E, E-1), Site Selection Criteria Study (Exhibit B) and, of course, ultimately, its execution of an amendment to the Annual Contributions Contract between the Federal Government and the Authority relative to funding the construction of the Site 30 project (Exhibit AD). Since construction of the Site 4 project depends on federal funding, currently not available, the various studies required prior to funding have not yet been undertaken by HUD.

This case has troubled us greatly. The goal of a racially, ethnically, and economically integrated community is sought by many, but the road to achieving it is protracted and ofttimes perilous, a course frequently encountered where objectives are laudatory. The hopes, fears and needs of different classes and races must somehow be reconciled if urban peace is to be attained. Our resolution of this litigation is, we hope, one more step towards that end.

For the reasons set forth above, therefore, we conclude that the evidence presented by plaintiffs is factually and legally insufficient to warrant the relief sought. Accordingly, with the exception of plaintiffs' motion for counsel fees, which we will consider at a later time, judgment shall be entered in favor of defendants.

The foregoing shall constitute the Court's findings and conclusions of law.